# United States Court of Appeals
## For the First Circuit

No. 02-2658

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN M. CRUZADO-LAUREANO,
Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

Alexander Zeno for appellant.
Thomas Klumper, Assistant U.S. Attorney, with whom H.S. García, U.S. Attorney, and Nelson Pérez-Sosa, Assistant U.S. Attorney and Senior Appellate Attorney, were on brief, for appellee.

April 5, 2005

**LIPEZ, <u>Circuit Judge</u>.**  On January 8, 2001, Juan Manuel Cruzado Laureano, sometimes called "Manny" for short, took office as mayor of Vega Alta, one of Puerto Rico's municipalities.  On January 25, 2002, a federal grand jury returned a superseding indictment that charged him with a number of crimes tied to abuse of his public office, including extortion, embezzlement, theft, money laundering, and witness tampering.  After a fourteen-day trial, Cruzado was convicted of the following charges: one count of embezzlement from a program receiving federal funds, 18 U.S.C. § 666(a)(1)(A)(i) and (a)(1)(A)(ii); five counts of extortion, <u>id.</u> § 1951(a); five counts of money laundering, <u>id.</u> § 1956(a)(1)(B)(i) and (a)(1)(B)(ii); and one count of tampering with witnesses, <u>id.</u> § 1512(b)(1) and (b)(2).  The district court sentenced Cruzado to 63 months' imprisonment on all counts except for the witness tampering, for which Cruzado received 12 months.  The sentences were to run concurrently with each other.  In this appeal, Cruzado challenges the sufficiency of the evidence supporting his counts of conviction.  He also argues that his sentence was erroneously calculated.  Although we affirm the convictions, we vacate the sentence and remand for resentencing.

## I.

We first provide a brief overview of the case, taking our information from the record as viewed in the light most favorable to the jury's verdict.  <u>See</u> <u>United States</u> v. <u>Lara</u>, 181 F.3d 183,

190 (1st Cir. 1999). We reserve a fuller discussion of the facts for later sections to which they are particularly relevant.

After graduating from the University of Puerto Rico in 1969, Cruzado taught advanced mathematics at a local high school until 1976. At that point, he moved into the construction business. In 1992, he went into business with his then-wife, a pediatric dentist, who opened a medical practice, incorporated as Oficina Dental Las Colinas, Inc., often referred to by its acronym, Onaden, Inc. From 1992 to 1995, Cruzado handled routine administrative tasks for Onaden, including the opening of a bank account at a local branch of Banco Popular, which would later prove useful to his criminal endeavors. The account, in the name of Oficina Dental Las Colinas, Inc., with Cruzado as the only signatory, was used for such items as lease payments. When Cruzado became mayor, however, he did not disclose the account's existence as required by the Ethics Office for the Commonwealth of Puerto Rico.

From 1996 to 2000, Cruzado ran a check-cashing business, El Cajero Expresso. In November 2000, Cruzado was elected mayor of Vega Alta -- his first try at running for public office -- as a member of the Popular Democratic Party and was duly sworn into office on January 8, 2001. Upon his election, Cruzado appears to have sold the check-cashing business to his oldest son, who took over day-to-day control. Cruzado, however, retained the last word

in business affairs and kept control over the business's checking account.

Within a scant few weeks of becoming mayor, Cruzado began using his official position to embezzle and extort thousands of dollars from the municipality and from contractors who were working for the municipality; he then laundered the money in the Onaden bank account. We now describe the particulars of his criminal activity. (See the chart, attached as an appendix, for a summary of the charges and parties involved.)

### A. Cristalería Vega Alta, Inc.

Cristalería Vega Alta is a firm that installs and repairs glass and aluminum doors. Cristalería's owner, Juan Cuevas Rodríguez, first got to know Cruzado through Cristalería's glass work for Cruzado's construction business. Shortly after Cruzado took office in January 2001, he embarked on an extensive program to renovate Vega Alta's city hall, which was in poor shape. Cruzado requested that Cristalería perform some locksmithing and remodeling work on the building, and he asked Cuevas for a price estimate. Cuevas quoted a price of $5,814. Cruzado then told Cuevas to add $2,000 to his quote and give the extra money to him. Fearing that he might be cut off from future work if he disobeyed, Cuevas obliged.

Cristalería's contract provided that the company would be paid from a trust account of the municipality at Banco Santander,

whose funds were reserved for making improvements to the city hall. For some reason, there was a delay in the disbursement of those funds. Cruzado spoke to Vega Alta's director of finance, Damien O. Colón Pabón, telling him that Cristalería was getting impatient about the delay and asking whether the municipality could expedite payment. Colón told Cruzado that the municipality's regular checking account might be faster, although disbursing funds from that account would require additional paperwork: price quotes, invoices, and various other papers. Also, when Banco Santander eventually made the disbursement from the trust account, that money would have to be put into the municipality's checking account.

Cruzado then informed Cuevas that, to be paid, he would need to procure some other, competing bids that were higher than Cristalería's. Cuevas complied: he approached two competing glass shops and told them to prepare fake bids that were higher than Cristalería's quote. They agreed to do so, even though they had no intention of submitting a formal bid for the work.

On April 4, 2001, the check from the trust account to pay Cristalería for its work was delivered to Cruzado's office. Colón requested that the mayor deposit the check into the municipality's checking account. The mayor responded that Cristalería would be working for the municipality in the future, and that the check would be used to pay for that work. Colón criticized that plan, reaffirming that the check should go into Vega Alta's checking

-5-

account and that, if Cristalería needed to be paid for new work, then a new contract should be drawn up and the disbursements could be made on that basis. Cruzado assured Colón that those formalities were not necessary; he would be responsible for retaining the check and making payments to Cristalería.

Cristalería was then paid twice for its work, receiving checks from both of Vega Alta's bank accounts. Specifically, on March 23, 2001, Cuevas picked up a check from city hall, drawn on the municipality's regular checking account, for the inflated price of $8,549 (minus a certain sum that Cuevas owed the municipality in licensing fees). Cuevas deposited that check in Cristalería's bank account. Then, on April 4, 2001, Cuevas received a visit in his office from Cruzado, who came bearing another check, this one also for $8,549 (again, minus certain immaterial deductions) drawn from the trust account. Cruzado told Cuevas to take the check, explaining that Cristalería would earn the double payment by doing more jobs for Vega Alta in the future. The next day, April 5, 2001, Cuevas issued two checks drawn on Cristalería's account, each for $2,000: one made out to "cash," and one made out to "Onaden, Inc.," according to Cruzado's instructions. Cruzado's chauffeur cashed the first check at the check-cashing business of Cruzado's son and gave Cruzado the money, while Cruzado deposited the second check into the Onaden account at Banco Popular.

In early October 2001, Cruzado asked to meet with Cuevas,

-6-

telling him he had something important to discuss. He claimed that he was being audited, and that he was nervous about the $2,000 check that Cuevas had issued to Onaden, Inc. Cruzado told Cuevas that, if asked about the check, he should say that it was a repayment of a loan extended to him by Cruzado before becoming mayor.

### B. Sidney Travel and Tours, Inc.

In 2001, Vega Alta was celebrating its 225th anniversary and, at Cruzado's request, the organizers of the annual Puerto Rico Day Parade in New York were going to dedicate that year's parade to the town. As mayor, Cruzado formed a committee, called the Puerto Rico Day Parade Committee, to raise money and arrange for Vega Alta's delegation to travel to New York for the June parade. The committee, which was composed of governmental employees and representatives from local cultural groups, opened a checking account under the name "Centro Cultural de Vega Alta," which had two signatories, neither of whom was Cruzado. The Committee chose a local travel agency, Sidney Travel and Tours, to arrange for airplane tickets, ground transportation, and hotels. Cruzado was the only member of the committee who was handling lodging and hotel accommodations. Sidney Travel's owner, Lilia Alonso Alvarez, had numerous contacts over the next few months with the committee while planning the trip to New York. Between April and June 2001, the committee raised about $160,000: $40,000 given by the

municipality's assembly, the rest through private donations. Any money not needed for the trip was to be refunded to the municipality.

The committee put down an initial deposit with Sidney Travel to secure plane and hotel reservations. As the date of the parade neared and the travel arrangements assumed their final form, Alonso calculated that (1) the committee owed Sidney Travel $67,240.90; and (2) Sidney Travel owed the committee a refund of $14,816.74, which could be offset against the larger amount. Alonso informed the committee of her tally. On May 25, 2001, Cruzado arrived at Sidney Travel for a financial reckoning, bearing a blank check from Centro Cultural's account. He was alone. Instead of allowing Alonso to credit the entire $14,816.74 to the committee's account, Cruzado told her that he wanted part of the credit as a separate payment, which would be useful to him as food money for children who would be attending the parade. So instructed, Alonso made out a check for $5,816.74 to Onaden, Inc., and credited the remaining $9,000 to the committee's balance. The mayor then paid off the balance with a Centro Cultural check for $58,240.90. He later deposited the Onaden check into his private account.

In New York, Cruzado stayed at the Grand Hyatt Hotel, while most of Vega Alta's other parade attendees stayed at the Marriot Marquis. On June 11, 2001, the day after the parade,

Cruzado sent a messenger to speak to Marilyn García, who served as one of the two signatories on Centro Cultural checks. Cruzado's message: he wanted three signed, blank checks drawn on the Centro Cultural account. García handed over the checks. Cruzado made out the first two checks to the Grand Hyatt; the third, he made out to Onaden, Inc., in the amount of $4,164. On July 3, 2001, that check was deposited in the Onaden account.

On July 6, 2001, after the trip was over, Sidney Travel made a final accounting. Again, a refund was due to the committee. Cruzado went to Sidney Travel himself and instructed Alonso to issue a check in the name of Onaden, Inc., for $8,174.80. Later, that check was deposited into Onaden's account.

On August 3, 2001, the Federal Bureau of Investigation spoke to Alonso about Cruzado's role in the committee's travel preparations. The next day, she informed Cruzado of the FBI's interest in his dealings. Cruzado then made out an Onaden check for $13,991.54 (the total of Sidney Travel's May 25 and July 6 checks to Onaden), dated it July 7, 2001, and deposited it into the Centro Cultural account on August 13, 2001.

### C. **Vega Alta Medical Hospital, Inc.**

Like city hall, Vega Alta's local health clinic, the Centro de Diagnóstico y Tratamiento (CDT), needed renovations. Located throughout Puerto Rico, CDTs provide basic health care to

local populations.[1]  Shortly before the events of this case, Puerto Rico had privatized many CDTs.  Vega Alta's CDT had been purchased by a partnership formed by two doctors: Luis González Bermúdez and Emilio Rivera Costas.  The partnership was named Vega Alta Medical Hospital, Inc.  The partners divided their responsibilities: Dr. González was the medical director, while Dr. Rivera was the administrator, handling tasks relating to maintenance, repair, and management.  The partners had agreed with the municipality (although not in a written contract) that Vega Alta would provide two services -- ambulance service, crucial to the CDT's functioning, as well as groundskeeping.  Vega Alta had also agreed to donate an old, unused mobile health vehicle, which the CDT could repair and then use to provide health care to rural and outlying areas.  Dr. González testified that the municipality was in charge of maintaining and fixing the CDT's physical facilities, as directed by Dr. Rivera.

Vega Alta's CDT also lacked air conditioning in the emergency room and administrative offices, a violation of Puerto Rico's health code.  The doctors had been soliciting quotes from several air-conditioning businesses to remedy the problem.  In

---

[1] Puerto Rican law defines a CDT as "an independent facility or one operated in conjunction with a hospital which provides community services for the diagnosis and treatment of ambulatory patients under the professional supervision of persons licensed to practice medicine, surgery or dentistry in Puerto Rico."  24 P.R. Laws Ann. § 331a(A)(4).

January 2001, Cruzado visited the CDT for the first time, where he met with Dr. Rivera, who explained to him some of their problems. Cruzado said that he would send over a company, Martínez Air Conditioning, who had done some work for the municipality in the past, and that Dr. Rivera need not continue seeking bids. Cruzado also informed Dr. Rivera that Martínez Air Conditioning would install an air-conditioning unit in the CDT's dentistry office, located in a dilapidated and partially abandoned annex to the main building. Dr. Rivera protested that his priority was to get air conditioning for the emergency room, but Cruzado persisted.

Cruzado subsequently paid the CDT another visit to speak to Dr. González, Dr. Rivera's partner. The two men were alone. Cruzado explained that his political party was trying to raise money through donations. Feeling pressured by the mayor's authority and aware of the CDT's critical need for ambulance service from the municipality, Dr. González told him that he would contribute, even though Dr. González did not belong to the mayor's political party. At the time, however, Dr. González did not give the mayor any money.

Martínez Air Conditioning then arrived on the premises, installed the air conditioner in the dentistry office, and invoiced the CDT for $2,895, which the CDT did not immediately pay. Meanwhile, Martínez sent an invoice to the municipality for the same amount, from which he received a check on May 4, 2001.

Shortly thereafter, the mayor asked Martínez to remove the air conditioner from the CDT, for reasons known only to himself, and to take it to a nearby police station. Martínez did so, and was paid for his trouble with an $850 check from the municipality dated June 14, 2001.[2]

On July 10, 2001, Cruzado arrived at the CDT and asked for money from Dr. Rivera, who understood the payment to be related to the air conditioner (which, by then, had already been both installed and removed). Dr. Rivera testified that he knew nothing about the political contribution that Cruzado and Dr. González had discussed. Dr. Rivera asked for an invoice; Cruzado left for five or ten minutes and returned with an invoice for $5,000 on letterhead reading "Onaden, Inc." The invoice referred, however, to work performed by Martínez Air Conditioning.[3]

Dr. Rivera had a blank payroll check available that had already been signed by Dr. González. When Dr. Rivera called Dr. González to inform him of the impending payment, the two partners did not discuss the purpose of the payment. Dr. Rivera merely

_____

[2] The record does not disclose if the emergency room eventually got an air conditioner.

[3] We note that the CDT had already received one invoice from Martínez Air Conditioning. Apparently, the CDT had also received an invoice from the municipality for the same air conditioner. According to Dr. González, however, the municipality bore the ultimate responsibility for maintaining the CDT's physical facilities. Given the various invoices flying back and forth, the precise division of financial obligations between the CDT and the municipality for the cost of the air conditioner is unclear.

informed Dr. González that the mayor was there looking for money, and Dr. González said that paying him was fine. According to their testimony, Dr. Rivera understood the payment to be for the air conditioner, and Dr. González understood the payment to be the political contribution that he had discussed with the mayor earlier. Dr. Rivera then handed Cruzado a $5,000 check made out to Onaden.

Later in October, while being investigated by the FBI, Cruzado spoke to Dr. Rivera. Cruzado told Dr. Rivera to "tell the truth," which, according to Cruzado, was that the payment was a political donation. Dr. Rivera refused, saying that he would maintain that the payment was for the air conditioner, as evidenced by the invoice.

### D. Ebanistería Familia

Ebanistería Familia is a woodworking shop in Vega Alta owned by Pedro A. Colón Muñoz, who knew Cruzado from patronizing his check-cashing business. During his mayoral campaign, Cruzado asked Colón for wooden poles to support advertising banners, which Colón provided free of charge. Soon after his election, Cruzado called Colón to city hall, where he explained that he wanted some glasswork and woodwork done in the lobby of the building, including seven wooden doors and some mahogany cabinets. Colón took some measurements and quoted a price of $7,500. Cruzado then requested some additional work. On February 12, 2001, Colón gave Cruzado a

written price quote for $9,200, which included the requested extra work. Colón testified that, typically, he requested a 50 percent deposit from customers before beginning work, which he uses to buy materials. He was told by Cruzado, however, that the municipality did not pay such deposits. Cruzado then offered to lend Colón the money from his son's check-cashing business. Colón went to El Cajero Expresso and received $5,200.

After Colón had begun the work, Cruzado told him to reduce the scope of the project, eliminating much of the extra work which would have raised the project cost to $9,200. Colón complied and eventually installed the woodwork at city hall. On April 4, 2001, Cruzado arrived at Colón's place of business bearing a $8,556 check ($9,200 minus 7 percent taxes), drawn on the municipality's trust fund at Banco Santander. Evidently, the municipality's payment had not been adjusted downward to account for the reduced work. Cruzado asked Colón to take the check and give the excess funds back in the form of a check payable to cash. Colón's wife, a certified public accountant who helped with the family business, later prepared a check payable to herself for $6,956 (the $5,200 loan plus the municipality's $1,756 overpayment), endorsed it, and gave the check to Colón. Colón dropped off the check, which was now as good as cash, at the check-cashing business of Cruzado's son. The check was later cashed.

### E. Premier Electrical and General Contractors, Inc.

Premier Electrical and General Contractors, Inc. (Premier Electrical), was owned by Juan Marrero Visalden, an electrician. On June 19, 2001, Marrero contracted with Vega Alta (Cruzado signed the contract) to build a local indoor basketball court, which would include cement foundations, bathrooms, a cafeteria, sidewalks, wiring work, and drainage. The base price for the project was $293,000; with some additional items, the total price was $342,000. After signing the contract, Premier Electrical began work in June or July.

Cruzado paid occasional visits to the site, observing the work and making casual conversation with Marrero. On one visit in September, Cruzado asked Marrero for a $10,000 payment for the Centro Cultural de Vega Alta. Marrero, who testified that he felt "rather stunned" by the request, agreed to pay. When Marrero asked how he could contact Cruzado, the mayor gave Marrero his business card, on which he had written his cell phone number.

On September 28, 2001, Marrero issued a $10,000 check payable to "Centro Cultural de Vega Alta," drawn on Premier Electrical's account. By coincidence, that same day Cruzado showed up at the project site. When Marrero told him that the check was ready, however, the mayor told him to prepare a different check payable to "cash." The mayor said that he needed the money to take care of some "problems" at the Centro Cultural. On October 15,

-15-

2001, Marrero followed those instructions, issued the new check, and gave it to the mayor at his office in city hall.

After Cruzado was arrested on October 24, Marrero discovered that the check had not been cashed yet. The next day, he ordered his bank to stop payment on it. Later, when Cruzado had posted bond, he paid another visit to the project site. Cruzado asked what Marrero had done with the check. When Marrero told him that he had stopped payment on it, Cruzado told him he had done, in Marrero's words, "a good job."

Later, when Cruzado was no longer mayor, he kept calling Marrero. For example, he informed Marrero that his company had won a bid that it had submitted to Vega Alta for improvements to a local baseball field. Marrero knew that he had won the bid but had yet to receive any official papers confirming that fact. In that conversation, Cruzado also asked him whether he had met with the FBI. When Marrero admitted that he had, Cruzado told him that he would have to call him back. Eventually, Marrero felt compelled to retain an attorney, who sent a letter to Cruzado asking that he stop calling and checking into Marrero's business affairs.

### F. Mundo Construction, Inc.

Mundo Construction, Inc., owned by Luis A. Vargas López, did business under the name Ferretería Mundo as a construction company and hardware store. Like Colón, the owner of Ebanistería Familia, Vargas knew Cruzado from using his check-cashing business.

Vargas, too, helped with Cruzado's mayoral campaign, setting up platforms for political rallies without charge. In September 2001, Cruzado took Vargas to a neighborhood in Vega Alta, where they discussed a possible construction project involving sidewalks, curbs, and drainage. Cruzado asked for a price quote from Vargas. A few days later, after taking some measurements, Vargas delivered a written estimate of $39,500 to the clerk's office at city hall. Vargas then received a telephone call from the mayor, who asked him to add $2,000 to his quote. Vargas refused, explaining that he was reluctant to pass the $40,000 mark in his bid.[4] Moreover, Vargas believed that Cruzado wanted the extra money for his private benefit. Consequently, Vargas refused to add $2,000 to his bid, and Cruzado then told him that the project would not be built because of a lack of funds. Cruzado was arrested shortly thereafter, and another contractor later completed most of the work that Cruzado and Vargas had discussed.

## II.

Some time in 2001, the federal government began investigating Cruzado's conduct. During that investigation, Cruzado added to his troubles when he attempted to tamper with

---

[4] For contracts worth more than $40,000, prospective contractors had to satisfy more formal bidding requirements imposed by Vega Alta. It appears that the price for the total project was already over $40,000, having been divided, somewhat artificially, into one bid for the sidewalks and curbs – $39,500 – and another bid for the drainage.

potential witnesses, the owners of Cristalería and Vega Alta Medical Hospital. The mayor was eventually indicted and arrested on October 24, 2001. Cruzado posted bond on November 2, 2001, and was released, whereupon he tampered with another potential witness, the owner of Premier Electrical.

On January 25, 2002, the grand jury returned a 14-count superseding indictment, charging Cruzado with the following offenses:

- Count 1: embezzlement, 18 U.S.C. § 666(a)(1)(A)(i) and (a)(1)(A)(ii);
- Counts 2, 4, 6, 12, 13, & 14: extortion, id. § 1951(a);
- Counts 3, 5, 7, 8, 9 & 10: money laundering, id. § 1956(a)(1)(B)(i) and 1956(a)(1)(B)(ii);
- Count 11: tampering with witnesses, id. § 1512(b)(1) and 1512(b)(2).

These counts are listed on the chart attached as an appendix to this opinion, which shows how Cruzado's laundering counts all derive from money that he was charged with embezzling or extorting.

Trial began on May 20, 2002. The government used a combination of testimony from Cruzado's victims and acquaintances, along with documentary evidence of cancelled checks and the like, to build its case. After the government rested on May 28, Cruzado filed a motion for judgment of acquittal on counts 1, 4 through 10, and 11 (thereby declining to challenge counts 2, 3, 12, 13, and 14). That motion was denied.

In his defense, through the cross-examination of government witnesses and his own testimony, Cruzado tried to

-18-

characterize some payments as political contributions; as for others, he stressed that they had been innocent mistakes and that he had eventually returned the money (he had returned some payments after the government had begun investigating his dealings). He also used character witnesses.

After Cruzado rested his case on June 5, he renewed his motion for judgment of acquittal, which the court granted as to count 10. On June 7, the jury found Cruzado guilty on all remaining counts except count 12, for which it returned a verdict of not guilty. On June 14, Cruzado filed a second motion for judgment of acquittal as to all remaining counts except 2, 3, 13, and 14, which the court denied on July 31, 2002. On November 8, 2002, Cruzado was sentenced to 63 months in prison for Counts 1 through 9, 13, and 14; and 1 year for Count 11, the terms to run concurrently. More than a year later, on November 24, 2003, the district court ordered Cruzado to pay restitution in the amount of $14,251.82 to Vega Alta.[5] This appeal followed.

### III.

We review de novo a district court's denial of a motion for judgment of acquittal under Fed. R. Crim. P. 29.[6] Our task is

---

[5] The government told us at oral argument that the district court had not made any findings as to loss amounts. It apparently overlooked the district court's restitution order.

[6] Fed. R. Crim. P. 29(a) provides in part: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment

-19-

to decide "whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994); see also United States v. Piper, 298 F.3d 47, 59 (1st Cir. 2002). The government may satisfy its burden of proof "by either direct or circumstantial evidence, or by any combination thereof." United States v. Gifford, 17 F.3d 462, 467 (1st Cir. 1994). Moreover, we must "resolve all credibility disputes in the verdict's favor." United States v. Taylor, 54 F.3d 967, 974 (1st Cir. 1995). Ultimately, the court "need not believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record." United States v. Gomez, 255 F.3d 31, 35 (1st Cir. 2001) (citation and internal quotation marks omitted).

Those daunting hurdles apply to the counts that Cruzado contested below with a Rule 29 motion. He faces an even greater challenge on the counts that he did not so contest: counts 2, 3, 13, and 14. Cruzado's failure to move for judgment of acquittal on those counts means that he must show "clear and gross injustice" to

of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

-20-

prevail now.[7]  United States v. Hadfield, 918 F.2d 987, 996 (1st Cir. 1990); see also United States v. Lopez, 380 F.3d 538, 547 (1st Cir. 2004).  With those principles in mind, we assess the sufficiency of the evidence, beginning with Cruzado's unpreserved challenges.

## A. Cruzado's unpreserved challenges

### 1. Three counts of extortion (Counts 2, 13, and 14)

To establish a violation of the Hobbs Act, 18 U.S.C. § 1951, the government must prove three elements beyond a reasonable doubt: (i) that the defendant induced someone to part with property; (ii) that the defendant knowingly and willfully did so by extortionate means; and (iii) that the extortionate transaction affected interstate commerce.  Id. § 1951(a).[8]  "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  Id. § 1951(b)(2).

Extortion by "fear" can mean fear of economic loss, including the possibility of lost business opportunities.  United States v. Bucci, 839 F.2d 825, 827-28 (1st Cir. 1988); see also

---

[7] Although Cruzado failed to move the court for judgment of acquittal on count 12, the jury ultimately acquitted him of that charge.

[8] In 1946, Congress passed the Hobbs Act to amend the 1934 Anti-Racketeering Act.  See Act of July 3, 1946, ch. 537, § 1(c), 60 Stat. 420.  Rep. Hobbs introduced the bill that became law.

<u>United States</u> v. <u>Hathaway</u>, 534 F.2d 386, 396 (1st Cir. 1976).  The government must "show that the victim believed that economic loss would result from his or her failure to comply with the alleged extortionist's terms, and that the circumstances . . . rendered that fear reasonable."  <u>Bucci</u>, 839 F.2d at 828; <u>see also</u> <u>United States</u> v. <u>Rivera Rangel</u>, 396 F.3d 476, 483 (1st Cir. 2005). Alternatively, to prove extortion under color of official right, "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."  <u>Evans</u> v. <u>United States</u>, 504 U.S. 255, 268 (1992).

### a.  *Extortion of Cristalería (Count 2)*

Count 2 charged that on April 5, 2001, Cruzado extorted money from Cuevas, Cristalería's owner, by asking him to inflate his price quote by $2,000 for work that he was doing at city hall. After Cuevas was paid twice for the same work (one payment from the municipality's trust account, one from the city's regular checking account), Cuevas paid Cruzado $4,000.

Cruzado first stresses that the only evidence as to Cruzado's reason for requesting an extra $2,000 was Cuevas's testimony, which he assails as "speculative."  Next, he claims that Cuevas never gave him the money.  Finally, Cruzado makes the curious argument that what really happened was theft, not extortion, because the money did not truly belong to Cuevas but to

-22-

the municipality: "In order for there to be extortion the money must have belonged to Mr. Cuevas.  However, the money they shared belonged to the municipality."

Cruzado's first two arguments reduce to a simple credibility dispute: Cuevas's account supports the conviction, while Cruzado's does not.  Appellate courts, however, are wisely reluctant to "second-guess" a jury's credibility determination. United States v. Carroll, 105 F.3d 740, 743 (1st Cir. 1997); see also United States v. Laboy-Delgado, 84 F.3d 22, 27 (1st Cir. 1996).  In the context of a sufficiency challenge, moreover, we are bound to "resolve all credibility disputes in the verdict's favor." Taylor, 54 F.3d at 974.  A reasonable jury could have rejected Cruzado's self-serving testimony, finding instead that Cuevas was telling the truth.

Cruzado's third argument -- that the money was not legitimately Cuevas's to begin with -- also fails.  The statute does not require that a victim of extortion part with his own property.  Indeed, "a defendant's claim of right to the property is irrelevant.  One may be found guilty of extortion even for obtaining one's own property." United States v. Sturman, 49 F.3d 1275, 1284 (7th Cir. 1995).  To be sure, the rightful owner of the $4,000 was the municipality, not Cuevas; it was paying for work that it had not received.  Still, a reasonable jury could have found beyond a reasonable doubt that the mayor induced Cuevas to

-23-

part with the money when Cuevas had actual possession over the property -- actual possession being "the state of immediate, hands-on physical possession." United States v. Zavala Maldonado, 23 F.3d 4, 6 (1st Cir. 1994). Cuevas had deposited one of Vega Alta's checks into his bank account and had cashed the other; it was solely because of the mayor's actions that he relinquished control over that money.

### b. *Attempted extortion of Premier Electrical (Count 13)*

Premier Electrical's owner, Marrero, had contracted with the municipality to build an indoor basketball court. Cruzado asked him for $10,000, supposedly on behalf of the Puerto Rico Day Parade Committee, which was having unspecified "problems." Ultimately, Marrero gave the mayor a check payable to "cash" but was able to stop payment after Cruzado was arrested.

Cruzado argues that he requested the $10,000 as a political donation to Centro Cultural, "an entity controlled by his party." He thereby tries to use the requirement that a specific quid pro quo is necessary for conviction under the Hobbs Act when an official receives a political contribution. See McCormick v. United States, 500 U.S. 257, 273 (1991) (official is guilty of extortion "if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act"). Here, Cruzado avers that he promised nothing specific in return for accepting the "contribution," and that

-24-

therefore a reasonable jury could not have found him guilty.

This argument leads nowhere. Although Cruzado asserts that the payment was a political contribution, he does not point to any evidence showing that Centro Cultural was a political body or had anything to do with his political campaign. In fact, Centro Cultural was not under the control of Cruzado's political party or of any political party. While the committee had a number of governmental representatives on it, there was no testimony that they were members of a particular party. Moreover, the governmental representatives were outnumbered on the committee by members of other cultural groups, which belies the idea that the committee was "controlled" by Cruzado's party.

Finally, according to the testimony of Premier Electrical's owner, Cruzado requested in the end that the check be made out to "cash," not "Centro Cultural." A reasonable jury could have inferred that Cruzado intended not to use the money for anything related to the committee's activities (especially because the committee was formed specifically for the Puerto Rico Day Parade, then more than three months in the past), and that Cruzado intended to cash the check and take the money for himself. The jury could have further inferred from Marrero's testimony that, if he did not pay Cruzado, the mayor would use his official power to punish Marrero in the future by withholding city business.

### c. Extortion of Mundo Construction (Count 14)

Like Cristalería, Mundo Construction was a prospective contractor with the municipality. Its owner, Vargas, knew Cruzado from his check-cashing business and had donated free supplies to his political campaign. As he did with Cristalería's owner, Cruzado asked Vargas to pad his price quote with an extra $2,000, without explaining the purpose of the extra money. Vargas understood, however, that the money was for the mayor's private benefit. When Vargas refused to pay, Cruzado suddenly told him that there was no money after all for the project to build sidewalks, curbs, and drainage.

Cruzado assails this conviction as being based on sheer speculation as to his intent. It is true that, in this instance, the jury did not have the benefit of following the transaction through to completion, with the victim's checks deposited in the Onaden account (as with Cristalería). However, the jury was well within its rights to believe Vargas's testimony and to find that Cruzado canceled the project (which was later built by someone else) as a reprisal for Vargas's refusal to submit to his demands for money.

### 2. One count of laundering money from Cristalería (Count 3)

Cruzado received two $2,000 checks from Cristaleria: one payable to "cash," and one payable to "Onaden, Inc." His chauffeur cashed the first at the check-cashing business of Cruzado's son;

the second was deposited into Cruzado's private account.

To convict Cruzado of this offense, the government had to prove four elements beyond a reasonable doubt: (1) that Cruzado knowingly conducted a "financial transaction," (2) that he knew the transaction involved funds that were the proceeds of some form of unlawful activity, (3) that the funds involved were in fact the proceeds of a "specified unlawful activity," and (4) that Cruzado engaged in the financial transaction knowing that it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity. See U.S.C. § 1956(a)(1)(B)(i); United States v. Cornier-Ortiz, 361 F.3d 29, 37 (1st Cir. 2004); United States v. Martínez-Medina, 279 F.3d 105, 115 (1st Cir. 2002). A conviction requires evidence of intent to disguise or conceal the transaction, whether from direct evidence, like the defendant's own statements, or from circumstantial evidence, like the use of a third party to disguise the true owner, or unusual secrecy. See United States v. Castro-Lara, 970 F.2d 976, 981 (1st Cir. 1992) ("[C]ircumstantial evidence, in and of itself, is often enough to ground a conviction."); see also Bourjaily v. United States, 483 U.S. 171, 179-80 (1987) ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it.").

Cruzado essentially challenges only the fourth element, intent to conceal. In his view, merely depositing his ill-gotten

gains in the account of Oficina Dental Las Colinas, Inc., hardly signifies an intent to conceal. Cruzado was well known all over Vega Alta as the mayor and as a prominent citizen, and, according to him, no rational jury could conclude that Cruzado was trying to conceal the source of the money by depositing it in a bank where everyone knew him and knew his sources of income.

We are, to say the least, unconvinced by this argument. Cruzado deposited these funds, as he did with the other sums he acquired, in an account in the name of his then-wife's former dental practice, for which he was the only signatory, and which he failed to report upon being elected mayor. No one else knew of the account. Every witness asked about the account testified that he or she had never heard of "Onaden," but assumed that it was legitimate on the mayor's authority. A reasonable jury could easily have concluded that Cruzado intended to conceal the money there and use it for his own private purposes. We see no "clear and gross injustice" in this conviction. Hadfield, 918 F.2d at 996.

### B. Cruzado's preserved challenges

#### 1. One count of embezzlement or theft of more than $5,000 from Vega Alta (count 1)

To convict Cruzado on this count, the government had to prove three elements beyond a reasonable doubt: (i) that Cruzado was "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof;" (ii) that Cruzado

embezzled, stole, obtained by fraud, or converted or intentionally misapplied property "valued at $5,000 or more" from "such organization, government, or agency;" and (iii) that such "organization, government, or agency receives, in any one year period [federal funds] in excess of $10,000." 18 U.S.C. § 666(a) and (b). Theft can be committed in a variety of ways under § 666. "The first four prohibitions cover any possibility of taking money for one's own use or benefit. Intentional misapplication, in order to avoid redundancy, must mean intentional misapplication for otherwise legitimate purposes; if it were for illegitimate purposes, it would be covered by the prohibitions against embezzlement, stealing, obtaining by fraud, or conversion." United States v. Urlacher, 979 F.2d 935, 938 (2d Cir. 1992) (quoted in United States v. Cornier-Ortiz, 361 F.3d 29, 36-37 (1st Cir. 2004)). The total value of funds stolen can be aggregated to satisfy the $5,000 minimum that triggers criminal liability under § 666. United States v. Sanderson, 966 F.2d 184, 189 (6th Cir. 1992).

Cruzado concedes on appeal that he was an agent of a local government -- namely, the mayor of Vega Alta -- which received $10,000 or more in federal funds within a one-year period. He maintains, however, that the government failed to present sufficient evidence to allow a reasonable jury to conclude that he embezzled or stole more than $5,000 from Vega Alta. Without

explanation, Cruzado limits his possible wrongdoing to two transactions: (1) Centro Cultural's $4,165 check to Onaden, which Cruzado wrote while in New York at the Puerto Rico Day Parade; and (2) the $1,756 check made out to "cash," which he obtained from Ebanistería Familia's owner, Colón, and which represented an overpayment from Vega Alta for work that Colón had not done.

Cruzado argues that, first, he spent the $4,165 on expenses related to the trip to New York. Even if he had not, however, the money belonged not to the municipality but to the parade committee, which had received it from Vega Alta with "no strings attached." Therefore, if Cruzado stole any money, he did so from the committee, not Vega Alta. Second, Cruzado maintains that Colón owed him the $1,756 as interest on the money that Colón had borrowed from him as an advance. As noted, after Cruzado claimed that the municipality would not pay a deposit on Colón's newly contracted job (as Colón's other customers did), the mayor offered to provide a loan from his son's check-cashing business, El Cajero Expresso. Cruzado, in his words, "might be guilty of being a smart businessman and/or a usurer, but he was not being accused of usury."

The facts, when viewed in the light most favorable to the government, easily support Cruzado's conviction on this count. First of all, as the government points out, Cruzado neglects to consider other incidents besides the two he cites as possibilities.

For example, there was the $4,000 that he instructed Cristalería's owner to skim from Vega Alta's double payment to him (one payment from Vega Alta's trust account, and one from its regular checking account). While arguing against the extortion conviction vis-à-vis Cristalería, Cruzado himself virtually concedes the theft by writing, "Clearly, the evidence of what occurred on April 5th, 2001, the time period when the crime occurred, points to theft of Municipal funds, not extortion." In addition, there were two more payments related to the trip to New York; in both cases, Cruzado intercepted reimbursements from Sidney Travel that were intended for the committee (and, ultimately, the municipality) and deposited them in his own bank account. Those two payments amounted to $13,991.54.

Even considering the two payments alone that Cruzado cites, a reasonable jury could have found beyond a reasonable doubt that Cruzado took them for his own private gain. First, there is no evidence that Cruzado spent the $4,165 while in New York; to the contrary, that check was deposited into the Onaden account on July 3, several weeks after the trip had ended. Cruzado produced no receipts for the supposed expenditures.

His attempt to avoid the conviction by disputing that the municipality was the victim also fails. The parade committee, with Cruzado as its chairman, had agreed that any remaining funds would be given to the municipality. Furthermore, Vega Alta required an

-31-

accounting of the funds received by the committee. A reasonable jury could have found that, by taking the $4,165, Cruzado was intercepting the money from being ultimately reimbursed to the municipality and such an interception constituted theft under § 666.

A reasonable jury could also have disbelieved Cruzado's argument that the $1,756 that Cruzado took from Colón, Ebanistería Familia's owner, represented interest on a loan. Cruzado had no evidence for this interpretation besides his own self-serving testimony, while Colón testified that Cruzado had specifically requested that he receive the excess funds from Vega Alta's payment. Believing Cruzado's explanation would require a perfect coincidence between, on the one hand, the amount that Colón owed Cruzado in interest and, on the other, Vega Alta's overpayment to Colón. The jury could reasonably reject such an argument that "would elevate coincidence to an art form." Lara, 181 F.3d at 201.

### 2. Two counts of extortion

### a. Extortion of Sidney Travel (Count 4)

Cruzado twice intercepted refunds that Sidney Travel owed to the committee (and, ultimately, to the municipality) and deposited them in his private bank account. First, on May 25, 2001, he went to Sidney Travel and told its owner, Alonso, that instead of issuing a check to the committee, she should issue a check payable to Onaden, which he claimed to need for food money

for children who were traveling to New York. Alonso complied, issuing the check to a payee she had never heard of, in large part because of Cruzado's authority as the mayor. Second, on July 6, 2001, Cruzado again instructed Alonso to issue a check payable to Onaden, which he deposited in his private account. She complied again, largely for the same reasons.

Cruzado claims that he was not acting as a public official but only as the chairman of a non-profit organization which was unaffiliated with the municipality. Hence, the "under color of public office" element of extortion does not apply. Cruzado also argues that the money was due to the committee as a refund anyway. Cruzado was the authorized representative for the committee; Alonso knew that. Therefore, a rational jury could not conclude that Cruzado induced her to part with property for unlawful reasons, when he was merely asking her for a refund under the authority that he had. Finally, Cruzado argues that he returned the money as soon as he could (which happened to be soon after the government opened its investigation); he notes that there was no deadline to return the money, and he should not be punished for the government's unexpectedly hasty actions.

These are specious arguments. First, Cruzado did not divest himself of his authority as mayor when he walked in the door of Sidney Travel, especially when his mission on behalf of the parade committee was so closely tied to the municipality itself;

Cruzado was chairman because he was the mayor, the committee had several other government officials as members, and the committee's entire reason for being was the celebration of the municipality's 225th anniversary. A reasonable jury could have believed that Cruzado knew that his authority would allow him to obtain the refunds from Alonso, in return for his continued good graces and future business from the municipality.

Cruzado's other two arguments are easily dispatched. His argument that the money was owed to the committee anyway is simply question-begging. Of course the money was owed to the committee. Cruzado's criminal conduct relates to what happened to that money before it could get to the committee. Finally, Cruzado's argument that he returned the money (a point which he repeated throughout trial and on appeal) is little more than an implicit admission of guilt and a plea for leniency. The jury was entitled to accord little if any weight to such eleventh-hour maneuvers.

In short, Cruzado's mishmash of allegedly innocent mistakes and neutral explanations fails to convince us that a reasonable jury could not have found Cruzado guilty of extorting money from Sidney Travel.

### b. Extortion of Vega Alta Medical Hospital (Count 6)

On July 10, 2001, after Cruzado had arrived at the CDT asking for money, Dr. Rivera gave the mayor a $5,000 check payable to Onaden. Dr. Rivera testified that he understood the payment to

-34-

be for the air conditioner that had been installed in the CDT's dentistry office (at Cruzado's instruction), even though that air conditioner had by then been removed (again, at Cruzado's instruction). Dr. González, meanwhile, had earlier promised to give the mayor a $5,000 political contribution; he testified that he understood the July 10 payment to be for that purpose.

Cruzado repeats here his argument that what looks like extortion was in fact only a political contribution. To sustain a conviction under the Hobbs Act for political contributions, he stresses, requires showing that the public official promised a specific quid pro quo, see McCormick, 500 U.S. at 274, and he did not promise anything. In support of his argument, he describes the two doctors' testimony as contradictory, resolving that supposed contradiction in favor of Dr. González's professed understanding that the $5,000 payment was a political contribution. Cruzado argues that Dr. Rivera would not have paid for an air conditioner on July 10 which had already been removed by June 14. In Cruzado's view, then, Dr. Rivera testified untruthfully, and the $5,000 check must have been a political contribution as testified to by the person who authorized the check, Dr. González.

A reasonable jury could have found beyond a reasonable doubt that, despite the past discussion between the mayor and Dr. González of a political contribution, Cruzado asked for a check made out to "Onaden" so that he could deposit the check in his own

-35-

private bank account, and the doctors were too scared to refuse him. After all, they both testified to their critical dependence on the municipality for ambulance service. The jury could have further concluded that the sham invoice given to Dr. Rivera served to cover the illegal conduct initiated by Cruzado. The mystery of paying for an air conditioner that had already been removed from the CDT's premises only further buttresses such an inference. And Cruzado never explains what connection Onaden might have had to Cruzado's Popular Democratic Party, or why he gave Dr. Rivera an invoice for air-conditioning work in exchange for a political contribution.

### 3. Four counts of laundering money

Cruzado was convicted of laundering money derived from illegal transactions involving Sidney Travel (counts 5 and 8), Centro Cultural (count 7), and Vega Alta Medical Hospital (count 9). Cruzado's argument here is the same as his argument for the count charging him with laundering money from Cristalería: no rational jury could conclude that Cruzado was trying to conceal the source of his money, when he was simply depositing the money in a bank where everyone knew him and knew his sources of income.

Our response, too, remains the same. A reasonable jury could easily have concluded that Cruzado was concealing these funds in the Onaden account, which was unknown to anyone else and for which he was the only signatory. That is a paradigm case of money

-36-

laundering, and a reasonable jury was free to so find beyond a reasonable doubt.

### 4. One count of tampering with three potential witnesses (Count 11)[9]

To convict Cruzado on this count, the government had to prove beyond a reasonable doubt that he: (i) knowingly (ii) used intimidation, threatened, corruptly persuaded another person, or attempted to do so, or engaged in misleading conduct toward another person (iii) with intent to influence testimony (iv) in an official proceeding. 18 U.S.C. § 1512(b)(1). Trying to persuade a witness to give false testimony counts as "corruptly persuading" under § 1512(b). United States v. Khatami, 280 F.3d 907, 912-13 (9th Cir. 2002) (citing cases). However, "it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully." 18 U.S.C. § 1512(e) (2005) (formerly subsection (d)).

The jury found Cruzado guilty of tampering or attempting to tamper with the testimony of Cuevas (Cristalería's owner) on or

_____

[9] Cruzado erroneously contends that the jury found him guilty of tampering with Lilia Alonso Alvarez (Sidney Travel's owner) in a telephone call on August 4, 2001; Milton Martínez Arroyo (owner of Martínez Air Conditioning) in late 2000 or early 2001; and Luis A. Vargas López (owner of Mundo Construction, Inc.) in a telephone call on December 9, 2001. The jury found him not guilty as to those incidents.

-37-

about October 9, 2001; Drs. González and Rivera (owners of Vega Alta Medical Hospital, Inc.) on October 17, 2001; and Marrero (owner of Premier Electrical) in a telephone call on December 10, 2001.

Cruzado's argument is simple: all he did was urge witnesses to tell the truth, which is not a crime. According to the witnesses, Cruzado did ask that they tell the truth; however, his version of "the truth" that he urged upon them was anything but the truth. To Cuevas, Cruzado described the $4,000 as repayment of a loan extended to Cuevas before he became mayor. At first, Cuevas maintained that story in front of the FBI. He then changed his tune, admitting that the money was skimmed from the inflated bid he submitted to Vega Alta and the double payment he received in return. As for the doctors, the jury was entitled to reject Cruzado's characterization of the $5,000 payment as a political contribution, and instead find that the doctors' need for the mayor's good graces induced them to hand over the money. Even with respect to Dr. Rivera's testimony -- that he believed the money was for the air conditioner, as evidenced by the invoice he received (on Onaden letterhead) -- the jury could have found that Cruzado was trying to persuade a witness to testify to something other than his true beliefs. Finally, the jury could have found that Cruzado's repeated calls to Marrero and his continued interest in Marrero's business affairs, which culminated in Marrero's hiring a

lawyer to send a cease-and-desist letter, constituted tampering.

## III.

### A. Choosing the correct guidelines manual

As a threshold matter, a sentencing court must first decide which edition of the sentencing guidelines to use. A defendant should be sentenced according to the guidelines in effect on the date of sentencing, unless "the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution," in which case "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." USSG § 1B1.11(b)(1).[10] Cruzado was sentenced on November 8, 2002, seven days after the November 1 effective date of the 2002 guidelines. Nevertheless, the PSR used a two-year-old edition of the guidelines, its only explanation being the flat assertion that the "2000 edition . . . has been used in this case to comply with the provisions of Guidelines § 1B1.11(b)(1)." The district court followed the PSR's lead and sentenced Cruzado under the 2000 edition of the guidelines.

The PSR and the district court made a mistake, however,

_____

[10] The Constitutional prohibition against ex post facto laws, U.S. Const., art. I, § 9, cl. 3, requires that a defendant be sentenced under the guidelines in effect when he committed the offense, rather than those in effect at time of sentencing, where subsequent amendments would have increased his punishment. See United States v. Colón-Muñoz, 318 F.3d 348, 361 (1st Cir. 2003).

-39-

because Cruzado's last offense of conviction occurred on December 10, 2001, thereby making the 2001 guidelines -- not 2000 -- the relevant comparison with the 2002 guidelines for ex post facto purposes. Even in a complex case like this one, involving conduct that occurred on dates implicating different versions of the manual, "it will not be necessary to compare more than two manuals to determine the applicable guideline range -- the manual in effect <u>at the time the last offense of conviction was completed</u> and the manual in effect at the time of sentencing." <u>Id.</u> § 1B1.11, cmt. background (emphasis added).

Count 11 charged Cruzado with, among other things, unlawful conduct on December 10, 2001 -- tampering with the owner of Premier Electrical. Cruzado was convicted of that offense. December 10, 2001, was more than a month after the effective date of the guidelines' 2001 edition. Therefore, the comparison for ex post facto purposes is between the 2002 edition and the 2001 edition. As it turns out, the relevant sentencing guidelines did not change between those two years. Therefore, Cruzado is right that he should have been sentenced under the 2002 guidelines, and the court, misled by the PSR, plainly erred in applying the 2000 guidelines.

**B. Reasons for remanding**

Arguably, we could continue our analysis to see if Cruzado was prejudiced by the application of the 2000 guidelines.

See United States v. Sedoma, 332 F.3d 20, 28 (1st Cir. 2003) (reviewing a sentence for plain error).  That analysis might reveal that a sentence under the 2002 guidelines would involve the same guidelines range as the 2000 guidelines.  On the other hand, Cruzado argues that he would receive a lower sentence under the 2002 guidelines, while the government and the district court believe that he would receive a higher sentence.  For two reasons, however, we decline to undertake such an analysis here.

First, between the 2000 and 2002 editions, the sentencing commission introduced a major change in the way that sentences for money laundering are calculated.  The 2000 guidelines simply gave a fixed number as the base offense level for money laundering.  The 2002 guidelines take a more complicated approach by incorporating the offense level of the underlying offense.[11]  Sentencing under that new regime might involve factual disputes or legal issues which the district court has not yet had an opportunity to address. If we were to explore this uncharted territory ourselves, we, in effect, would be doing the sentencing rather than the district court.  That is not an appropriate allocation of functions.  See Koon v. United States, 518 U.S. 81, 98 (1996) ("District courts have an institutional advantage over appellate courts" in some

_____

[11] The laundering guideline says to use the "offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense . . . ; and (B) the offense level for that offense can be determined."  USSG § 2S1.1(a)(1).  Both conditions are true for Cruzado.

-41-

sentencing matters.); <u>United States</u> v. <u>Rivera</u>, 994 F.2d 942, 950 (1st Cir. 1993) (Breyer, C.J.) (referring to district courts' "institutional strength" as being able to "best understand the relation of the Guidelines to case-specific, detailed facts").

Second, after <u>United States</u> v. <u>Booker</u>, 543 U.S. __, 125 S. Ct. 738 (2005), the sentencing guidelines are now advisory rather than mandatory. <u>See</u> <u>also</u> <u>United States</u> v. <u>Antonakopoulos</u>, 399 F.3d 68 (1st Cir. 2005). That legal development injects even more uncertainty into an attempt by us to reconstruct a sentencing decision by the district court under the 2002 guidelines. Therefore, we conclude that the most prudent course is to vacate the sentence and remand for resentencing under the correct edition of the guidelines.

## IV.

We **AFFIRM** Cruzado's convictions. We **VACATE** Cruzado's sentence and **REMAND** for further proceedings not inconsistent with this opinion.

## Appendix

| | Embezzlement & Theft | Extortion | Laundering[12] | Tampering |
|---|---|---|---|---|
| **Count 1: 18 U.S.C. § 666(a)(1)(A)(i) and (a)(1)(A)(ii)** | Between Mar. 2001 & Jan. 25, 2002: stole more than $5,000 from Vega Alta. | | | |
| **Count 2: id. § 1951(a)** | | April 5, 2001: $4,000 from Cristalería | | |
| **Count 3: id. 1956(a)(1)(B)(i) and (a)(1)(B)(ii)** | | | April 6, 2001: cashed one $2,000 check, deposited another $2,000 check from Cristalería | |
| **Count 4: id. § 1951(a)** | | May 25 & July 6, 2001: $13,991.54 in refunds from Sidney Travel | | |
| **Count 5: id. § 1956(a)(1)(B)(i) and (a)(1)(B)(ii)** | | | May 30, 2001: deposited $5,816.74 check from Sidney Travel | |
| **Count 6: id. § 1951(a)** | | May 25 & July 6, 2001: $5,000 from Vega Alta Medical Hospital | | |
| **Count 7: id. § 1956(a)(1)(B)(i) and (a)(1)(B)(ii)** | | | July 3, 2001: deposited $4,165 check from Centro Cultural | |

[12] Except where noted (i.e., count 10), all deposits were checks made payable to Onaden, Inc., and deposited into Cruzado's "Oficina Dental Las Colinas, Inc." account at Banco Popular, Vega Alta branch.

| Count 8: id. § 1956(a)(1)(B)(i) and (a)(1)(B)(ii) | | | July 9, 2001: deposited $8,174.80 check from Sidney Travel | |
|---|---|---|---|---|
| Count 9: id. § 1956(a)(1)(B)(i) and (a)(1)(B)(ii) | | | July 11, 2001: deposited $5,000 check from Vega Alta Medical Hospital | |
| Count 10 (later dismissed): id. § 1956(a)(1)(B)(i) and (a)(1)(B)(ii) | | | Sept. 25, 2001: deposited $3,788.51 check from Centro Cultural to "Cash" in "El Cajero Expresso" account | |
| Count 11: id. § 1512(b)(1) and (b)(2) | | | | Between Aug. 2001 & Dec. 2001, tampered with owners of Cristalería, Vega Alta Medical hospital, & Premier Electrical (found not guilty of tampering with Sidney Travel, Martínez Air Conditioning, & Mundo Construction) |
| Count 12 (not guilty): id. § 1951(a) | | June & July 3, 2001: Cristalería | | |
| Count 13: id. § 1951(a) | | Between Sept. & Oct. 15, 2001: $10,000 from Premier Electrical | | |
| Count 14: id. § 1951(a) | | Sept. & Oct. 2001: $2,000 from Mundo Construction | | |