# United States Court of Appeals
## For the First Circuit

Nos. 10-1518,
     10-1534,
     10-1701,
     10-1708

UNITED STATES OF AMERICA,

Appellee,

v.

CARLOS PAGÁN-FERRER,
JUAN MORALES-ROSADO,
JOSÉ PACHECO-CRUZ,
AARON VIDAL-MALDONADO,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Torruella, Lipez and Thompson,
Circuit Judges.

Paul M. Glickman, with whom Glickman Turley LLP, was on brief for appellant Pagán-Ferrer.
Lydia Lizarríbar-Masini, for appellant Morales-Rosado.
Juan A. Pedrosa-Trápaga, with whom Juan A. Pedrosa Law Office, PSC, was on brief for appellant Pacheco-Cruz.
James L. Sultan, with whom Jonathan P. Harwell and Rankin & Sultan, was on brief for appellant Vidal-Maldonado.
Sharon M. McGowan, Attorney, U.S. Department of Justice, Civil Rights Division, Appellate Section, with whom Jessica Dunsay Silver, Attorney, and Thomas E. Pérez, Assistant Attorney General, was on brief for appellee.

November 22, 2013

**TORRUELLA, Circuit Judge.** A jury convicted four former San Juan Municipal Police Department officers of charges stemming from the excessive use of force against a citizen who was violently beaten to death while in police custody. Appellants, now seeking to challenge their respective convictions and sentences, raise a number of issues on appeal, including one which requires us to examine the relationship between the Ex Post Facto Clause of the Constitution and the "one book" rule of the U.S. Sentencing Guidelines. We ultimately find none of the Appellants' arguments meritorious and thus affirm. We begin with the facts.

## I. Background

In the early morning hours of July 20, 2003, José Antonio Rivera-Robles ("Rivera") was running down the street, yelling that he was being followed and that "they" were trying to kill him. It was later discovered that he was under the influence of cocaine. Two San Juan Municipal Police Department ("SJMPD") officers who were patrolling the area spotted Rivera and got out of their patrol car to investigate. Rivera pushed past them and stole their patrol car, injuring the arm of the officer who tried to hold onto the car door as Rivera sped away. The officers radioed for help and a search for both Rivera and the patrol car began.

Rivera, meanwhile, had abandoned the car and entered a Citgo gas station's convenience store, appearing frightened but uninjured to those in the store. Rivera hid behind the store

-3-

counter, scaring away the store clerk, who ran outside to look for help. Several officers who were searching for Rivera drove by the gas station at that time, and the store clerk was able to flag them down. When Rivera ran outside, he was confronted by Officers Ángel González-Almeida ("González"), Marieli Torres-Rivera ("Torres"), and Wilbert Salas-López ("Salas"), all with guns drawn. As the officers approached, Rivera ran to and began pulling on a gas pump, stopped, and then walked back towards the officers. González pushed Rivera to the ground, face down, and Salas straddled him. At this point, Sergeant Aarón Vidal-Maldonado ("Vidal"), the highest ranking officer present and one of the four Appellants in this case, arrived at the gas station. Vidal helped Salas handcuff Rivera. At this point, however, instead of transporting the now-restrained suspect to the station house, several officers began assaulting Rivera.

Officer Elías Perocier-Morales ("Perocier") kicked Rivera in the head and left shoulder area with such force that it nearly knocked Salas, who was still on top of Rivera, over. Next, Officers Carlos Pagán-Ferrer ("Pagán"), Juan Morales-Rosado ("Morales"), and José Pacheco-Cruz ("Pacheco"), the three remaining Appellants in this case, arrived in the SJMPD's Impact Unit van. The Impact Unit officers formed a circle around Rivera and began kicking him with booted feet in the head and upper body while Vidal

-4-

and Salas restrained him.  Some of the officers, including Pagán, punched Rivera in the face.

Vidal eventually ordered that Rivera be taken to the Impact Unit station house, announcing "[t]his one's mine, this one's mine."  When he arrived and exited the police car, Rivera was barely conscious and fell to the ground.  Officer Juan Monserrate ("Monserrate") kicked the still-handcuffed Rivera in the face while Vidal looked on silently.  Rivera was then carried into the station, dropped on the floor, and had his handcuffs removed.  By this time, his breathing was labored and his face was "practically disfigured."  Someone called emergency medical services.

When the emergency responders arrived, they were told that Rivera had been lying on the floor, unconscious, for ten minutes.  They were unable to revive Rivera, and he was declared dead at the scene.  An autopsy later indicated that Rivera had suffered trauma injuries to approximately thirty places on his body and had died from brain hemorrhaging.  The report also stated that cocaine was found in his system and may have contributed to the cause of death, but the coroner later revised her report to indicate that blunt force trauma was the cause of death.  A forensic expert agreed. A second forensic pathologist corroborated that the victim's injuries were consistent with kicks, punches, and blunt force trauma.  In this second pathologist's opinion, the cause of death was not cocaine.  He also testified that Rivera's

facial injuries were not from a fall. A third pathologist, however, testified for the defense that it was "a medically reasonable probability" that the victim died because of cocaine use and that he did not find any fatal injuries on Rivera's body.

Puerto Rico Police Department officials began an investigation, and Vidal admitted to being at the Citgo station that night, but he said that no one had assaulted Rivera. Pagán, Morales, and Pacheco all claimed that they had not been at the Citgo station at all that night. They also denied knowing how Rivera sustained his injuries. Several years later, in 2008, the FBI began investigating the incident. Vidal continued to claim that no one had assaulted Rivera, and Pagán, Morales, and Pacheco continued to claim that they were not present at the Citgo station that night. They also denied having punched, kicked, or otherwise assaulted Rivera. Morales denied hearing that any officers had gone to the Citgo that night. He later repeated that statement to a federal grand jury.

On July 8, 2008, a federal grand jury indicted Vidal, Morales, Pacheco and Pagán (collectively, the "defendants") along with two other SJMPD officers, Perocier and Officer Eliezer Rivera-González, in a 17-count indictment. The latter two pled guilty and became cooperating witnesses. Vidal, Morales, Pacheco, and Pagán were indicted for depriving Rivera of his constitutional rights by using excessive force resulting in bodily injury or death while

acting under color of state law, in violation of 18 U.S.C. § 242. They were also indicted for making false statements, in violation of 18 U.S.C. § 1001, and for obstructing justice, in violation of 18 U.S.C. § 1512(b)(3).

On August 13, 2009, after twenty-six days of trial, a jury found all four defendants guilty of making false statements and obstructing justice. Morales was convicted of perjury before the grand jury, in violation of 18 U.S.C. § 1503(a). As to the civil rights charges, the jury found Morales and Pagán guilty of depriving Rivera of his rights and causing bodily injury. Vidal was found guilty of causing Rivera's death by failing to intervene and failing to keep Rivera from harm by officers under his supervision, in violation of 18 U.S.C. § 242. Vidal was also charged with kicking Rivera at the Impact Unit station house, in violation of 18 U.S.C. § 242, but he was found not guilty as to that count. Pacheco was found not guilty of using excessive force resulting in injury or death.

Vidal was sentenced to 360 months of imprisonment, Morales and Pagán to 120 months of imprisonment, and Pacheco to 57 months of imprisonment.

On appeal, defendants collectively have presented a total of eight issues which they believe warrant vacating their respective convictions or sentences: 1) the denial of a motion to supplement the record; 2) the denial of a motion to declare a

-7-

mistrial; 3) the denial of a motion to suppress an identification; 4) the insufficiency of the evidence; 5) the improper wording of a jury instruction; 6) the existence of a material variance; 7) the wrongful application of a revised Sentencing Guidelines manual; and 8) the denial of a downward departure at sentencing. Not every defendant asserts every claim. For the sake of clarity, we elaborate on the facts relating to each issue on appeal separately, and we take each issue in turn.

## II. <u>Discussion</u>

### A. Denial of Rule 10(e) motion to supplement the record

Defendants Pagán and Vidal argue that the district court erred in denying their joint motion to supplement the record on appeal pursuant to Federal Rule of Appellate Procedure 10(e) ("Rule 10(e)"). We begin with a review of the factual and procedural background related to this claim.

#### 1. Background

On August 2, 2011, while this appeal was pending, Pagán and Vidal filed with the district court a joint motion seeking to supplement the record on appeal pursuant to Rule 10(e). Pagán and Vidal argued that at least some portion of the jury selection proceedings were closed to the public and that the record did not clearly reflect that fact. Accordingly, they sought to conform the record to reflect what truly occurred below or, alternatively, to supplement the record to correct a material omission regarding the

closure. They also claimed that an evidentiary hearing was required.

As record evidence of possible closure, Pagán and Vidal cited statements by the district court judge during a portion of the jury selection proceedings:

> The Court is celebrating this hearing here in the jury room, since the Court is aware that we cannot ask the questions in the courtroom because an answer by a person, a petit juror, a potential petit juror, could potentially contaminate the entire panel and consequently the parties have all agreed to hold this phase of the jury selection here in the jury room.
> . . . .

They also provided affidavits from Pagán, Pagán's trial attorney, Vidal, and family members of both men stating that the public had been excluded from jury selection proceedings and that, at various times, officers of the court or the defense attorneys instructed family members that they could not attend portions of the jury selection proceedings. Critically, the affidavits also reveal that counsel for both Pagán and Vidal were aware of the alleged closure at the time it occurred, discussed the closure issue with their clients, and elected not to object to the closure.[1] Pagán and Vidal concluded by requesting that the district court hold a hearing on the question of whether the jury selection proceedings

---

[1] The affidavits also assert that neither Pagán nor Vidal were informed by counsel of their constitutional right to a public trial, but no ineffective assistance of counsel claims have been brought forth by either defendant in this direct appeal.

were open or closed, and that it correct the record to accurately reflect the nature of the proceedings.

The district court, in an order by the same judge who had presided over the jury selection proceedings in question, denied the joint motion without holding a hearing. After noting that Rule 10(e) allows a trial court to consider a dispute as to the record even while an appeal is pending, it explained that the request in this case was "untimely."[2] Specifically, the district court viewed the defendants' request as an impermissible attempt to add new information to the record, and it expressed concern that granting the motion would allow defendants to sandbag the courts with issues that should have been raised during trial while the trial judge had an "opportunity to rectify the alleged wrong."

**2. Applicable Law and Analysis**

Federal Rule of Appellate Procedure 10(e)(1) states, in pertinent part, "[i]f any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the

---

[2] Although the district court characterized the Appellants' Rule 10(e) request as "untimely," the court clearly explained that "Appellate Rule 10(e) authorizes the trial court to correct or modify the record on appeal when a dispute arises regarding that record. The trial court may consider the dispute even after the record has been transmitted to the appellate court." Order at 2, Aug. 26, 2011, ECF No. 557 (internal quotation marks omitted) (quoting In Re Food Fair, Inc., 15 B.R. 569, 571 (Bankr. S.D.N.Y. 1981)). In other words, the court clearly recognized that if the Rule 10(e) motion had been proper, it would have been timely filed even though Appellants had already filed a notice of appeal.

record conformed accordingly." Fed. R. App. P. 10(e)(1). Significantly, the rule requires that the district court settle the matter, not that it hold an evidentiary hearing. United States v. Brika, 416 F.3d 514, 530 (6th Cir. 2005). Federal Rule of Appellate Procedure 10(e)(2) adds that "[i]f anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded." Fed. R. App. P. 10(e)(2).

We review the district court's denial of a Rule 10(e) motion for abuse of discretion. Brika, 416 F.3d at 529; see also United States v. Kelly, 535 F.3d 1229, 1242 (10th Cir. 2008); United States v. Franklin, 250 F.3d 653, 663 (8th Cir. 2001). "When a dispute concerning whether the record truly discloses what occurred in the district court has been submitted to the district court, the court's determination is conclusive absent a showing of intentional falsification or plain unreasonableness." United States v. Serrano, 870 F.2d 1, 12 (1st Cir. 1989) (internal citations and quotation marks omitted); see also Brika, 416 F.3d at 529.

According to Pagán and Vidal, the district court abused its discretion when it denied their Rule 10(e) motion without an evidentiary hearing because the record suggests, but does not unequivocally show, that the jury selection was at least partially

-11-

closed to the public.  They argue further that the denial of their 10(e) motion prevents them from having a complete record to be able to brief this court on the closure issue.  We disagree.

As the district court correctly observed, Rule 10(e) is a mechanism by which the court can "correct omissions from or misstatements in the record for appeal."  Order at 2, Aug. 26, 2011, ECF No. 557 (citing S & E Shipping Corp. v. Chesapeake & O. Ry. Co., 678 F.2d 636, 641 (6th Cir. 1982)).  The Rule does not, however, "allow the court to add to the record on appeal matters that might have been but were not placed before it in the course of the proceedings . . . ."  United States v. Hillsberg, 812 F.2d 328, 336 (7th Cir. 1986); see also Anthony v. United States, 667 F.2d 870, 875 (10th Cir. 1980) (holding that 10(e) motion to supplement the record must be denied where appellant knew of but failed to introduce the relevant evidence at trial because Rule 10(e) "does not grant a license to build a new record").  In this case, the district court denied the Rule 10(e) motion because it "saw no need" to supplement the record with what it characterized as untimely or new information not within the purview of Rule 10(e).

A review of the record supports the reasonableness of the district court's finding that neither a hearing nor supplementation to clarify the record was necessary in this case.  Despite Pagán and Vidal's assertions that the record is unclear on the status of the jury selection proceedings, the transcripts clearly delineate

-12-

the events below.  On June 10, 2009, after polling potential jurors, the district court was alerted to the fact that multiple jurors had prior knowledge of the case at hand.  The court then elected to question each juror individually on the issue, and it discovered that some jurors had read or discussed a recent newspaper article describing the guilty plea of a co-defendant in the case.  Concerned about possible contamination, the judge -- with the assistance of defense counsel -- sought to discover what each juror had heard and from whom the juror had heard it.

The court held these individual juror interviews in the jury room, not the courtroom, in the presence of defense counsel and their clients.  The transcripts explicitly mark when the proceedings shifted to the jury room with an "Examination in the jury room" notation, Tr. of Trial Voir Dire 51, June 10, 2009,  and they also mark when the proceedings returned to open court, with a parenthetical notation that "[t]he following proceedings were had in open court," id. at 145.  Counsel for Pagán did request a sidebar with the judge immediately prior to the jury room voir dire, but it was not to object to the closure of jury selection proceedings; rather, he requested only that the court ask more explicit questions regarding contamination of the entire pool before moving to the jury room for individual examinations.  The court readily obliged.  In fact, the judge commented that trial counsel for Pagán had "taken the lead on this" and that it had no

objection if defense counsel wished to "continue suggesting to the Court questions relating to the potential contamination of these three jurors by outside information," during the jury room proceedings. Id. at 51. The judge also provided time for counsel to speak with him about the jury selection procedures before the individual jurors were sent to the jury room for questioning. Again, no one objected to conducting the questioning in the jury room.

The following day, on June 11, the transcript also clearly states that individual jurors were being questioned about possible contamination within the confines of the jury room. The district court judge, immediately after asking the clerk to call the case, stated the following:

> The Defendants are present here in the jury room since this procedure, it is best to hold it.
> And the Defendants are assisted by the official translator of the Court. The Court is celebrating this hearing here in the jury room, since the Court is aware that we cannot ask the questions in the courtroom because an answer by a person, a petit juror, a potential petit juror, could potentially contaminate the entire panel and consequently <u>the parties have all agreed to hold this phase of the jury selection here in the jury room</u>, the defendants being present.

Tr. of Trial Voir Dire 2, June 11, 2009 (emphasis added). Once again, the record shows that the defendants did not object to holding the contamination-related jury selection proceedings in the jury room; in fact, they "all agreed" to it.

-14-

The affidavits offered in support of the Rule 10(e) motion also reflect the parties' contemporaneous knowledge of closure and their decision to agree to it. Pagán's trial counsel stated that Pagán's family members, who he alleges were kept out of jury selection proceedings, repeatedly asked him if they could enter during jury selection, and that Pagán told him several times that he wanted his family members in the courtroom during jury selection. Pagán's counsel, however, told them that family members could not observe the proceedings and decided not to raise the issue with the court because he believed such an objection to the closure would be "counterproductive and futile." Vidal's affidavit similarly reveals that he discussed with his lawyer -- on the first day of jury selection -- his concern about the closure of jury proceedings, but his lawyer elected not to object to the closure. In other words, Pagán and Vidal admit that both they and their trial counsel were fully aware of closure concerns, but counsel consciously and purposefully chose to remain silent on the issue of closure and to acquiesce to the proceedings.

Now, Pagán and Vidal seek to capitalize on that same silence, suggesting that the resulting record lacks clarity on the issue of closure and that an evidentiary hearing is required. Rule 10(e), however, authorizes the modification of the record only to the extent it is necessary to "truly disclose[ ] what occurred in the district court." United States v. Kennedy, 225 F.3d 1187, 1191

-15-

(10th Cir. 2000). Rule 10(e) is not a vehicle for parties to raise a belated challenge to the course of proceedings below. See O'Connor v. Pierson, 426 F.3d 187, 195 n.1 (2d Cir. 2005) ("What the [party] sought was in fact a remand for the opportunity to raise the claim-preclusion defense for the first time in the district court. This [party's] failure to raise the defense is not the sort of 'error or accident' contemplated by Federal Rule of Appellate Procedure 10(e)(2). . . ."). Nor is Rule 10(e) an appropriate means for a party to "put[] additional evidence, no matter how relevant, before the court of appeals that was not before the district court." United States v. Rivera-Rosario, 300 F.3d 1, 9 (1st Cir. 2002).

Here, like the appellant in Rivera-Rosario, Pagán and Vidal seek to push Rule 10(e) beyond its bounds. Despite their claim of confusion, the record clearly documents the jury selection proceedings below, both when they were moved to the jury room and when they returned to open court. Additionally, the proffered complaints that family members were being kept from proceedings were not "omitted from . . . the record by error or accident," see Fed. R. App. P. 10(e)(2), but rather were kept from the trial court by choice of counsel. Accordingly, though we would have preferred a more comprehensive discussion of the Rule 10(e) motion's shortcomings from the district court in this case, we cannot find that the district court abused its discretion when it denied the

-16-

motion on the grounds that there was "no need to supplement the record" with such new material not permitted by Rule 10(e).

We therefore affirm the district court's denial of the joint Rule 10(e) motion. This holding, of course, does not prevent Pagán or Vidal from seeking post-conviction relief from the district court as to any potential constitutional claims underlying their Rule 10(e) motion.[3]

## B. Denial of motions for a mistrial

Morales, Pagán, and Vidal each argue that the district court erred in denying their motion for a mistrial. We begin once again with a review of the relevant facts.

### 1. Background

At trial on July 1, 2009, Torres testified as a witness for the government. She spoke in Spanish and her testimony was simultaneously translated into English. When asked on direct examination why, after previously withholding information about her colleagues' conduct at the gas station, she was now testifying against her fellow officers, Torres replied: "Because this time I already knew that the truth would come out because the civil trial

---

[3] Pagán and Vidal have not requested that we rule on the merits of their underlying Sixth Amendment claim of improper closure. In fact, they have asserted that they were not able to fully present the constitutional claim on appeal due to uncertainty in the record. While we are unpersuaded by Appellants' arguments as to the clarity of the record, we decline to press on to an analysis of the merits of a constitutional claim that is not squarely before us.

was over . . . ." Counsel for Pagán immediately objected, interrupting the translation of the remainder of Torres's sentence, which in Spanish had concluded "and that they had won the suit against the Municipality of San Juan." Counsel for Pagán moved for a mistrial, and the court excused the jury to hear argument on the issue. After some discussion, the district court requested briefing on the subject. The court recessed for the day fifty minutes early, and it reminded the jury that they would reconvene on July 13 after a previously scheduled and previously announced recess.

When trial resumed on July 14,[4] the district court announced in court and in a subsequently issued written order that it was denying the defendants' request for a mistrial and granting the government's motion for a curative instruction. The court stated that it was operating under the assumption that the jury had understood the entirety, including the untranslated portion, of Torres's testimony. It nevertheless determined that this was not a case of "extreme prejudice," and that the jury could be counted on to follow the court's instructions. After soliciting and incorporating feedback from defense counsel on the court's proposed curative instruction, it instructed the jury, in relevant part, as follows:

---

[4] The resumption of trial was delayed an additional day, until July 14, to allow for jury selection in an unrelated case.

-18-

[Y]ou may have heard the current witness on the stand, Sergeant Marieli Torres Rivera, reference a prior civil trial and the result thereof.

You should not, however, concern yourself with anything relating to that civil trial. . . . The prior civil trial mentioned by Sergeant Torres Rivera . . . involved different Defendants and different parties, different legal issues and a different burden of proof for the Plaintiffs.

. . . . The standard of proof in a civil case is merely the preponderance of the evidence as opposed to the Government requiring to prove all the elements of the counts of the indictment beyond a reasonable doubt.

Further, Defendants were not represented by counsel, as they were not a party and, hence, did not cross-examine or have the opportunity to present any evidence, if they so chose, in the civil case.

Finally, the Court reminds you that at the beginning of the case you were ordered that, and I quote, 'testimony that the Court has excluded and told you to disregard is not evidence and must not be considered,' end of quote.

The Court strikes testimony of Sergeant Torres Rivera's reason for changing her testimony, and the existence and result of a civil case, and you are strictly ordered not to consider under any circumstances said testimony about the case.

. . . .

[I]t would be entirely improper and in violation of your oath for you to consider the existence and the outcome of the civil trial wherein Defendants were not parties in your deliberations.

This instruction was delivered to the jurors immediately upon their return on the first day of trial after the recess.

-19-

## 2. Applicable Law and Analysis

In the event that the jury has been exposed to improper evidence, the trial court must strike the evidence and provide an appropriate curative instruction unless the evidence was so "seriously prejudicial" that "a curative instruction will be an insufficient antidote." United States v. Sepúlveda, 15 F.3d 1161, 1184 (1st Cir. 1993). "Declaring a mistrial is a last resort, only to be implemented if the taint is ineradicable . . . ." Id. When reviewing the denial of a motion for a mistrial, "we consider the totality of the circumstances to determine whether the defendant has demonstrated the kind of 'clear' prejudice that would render the court's denial of his motion for a mistrial a 'manifest abuse of discretion.'" United States v. Dunbar, 553 F.3d 48, 58 (1st Cir. 2009) (quoting United States v. Freeman, 208 F.3d 332, 339 (1st Cir. 2000)). Essential to this determination are the following three factors: 1) whether an appropriate curative instruction was issued, 2) whether the judicial response was timely, and 3) whether appellants successfully rebutted the presumption that the jury followed the judge's instructions. See Sepúlveda, 15 F.3d at 1185.

We begin by considering whether the court issued an appropriate curative instruction. Appellants contend that the court's instruction magnified rather than remedied the risk of prejudice because it reinforced or vouched for Torres's testimony,

at least in so far as it confirmed the existence of a related civil case.  Appellants reason that as a result, the jurors could have inferred that the successful "suit against the Municipality of San Juan" was in fact a jury verdict against the police force premised on the same facts as the criminal case at hand.

Although we recognize the potential for a prejudicial inference, even if a juror made the inferences Appellants suggest, however, the court's forceful curative instruction expressly dealt with precisely these concerns.  In the instruction, which neither repeated the improper testimony nor reminded the jury of the civil trial's outcome, the court repeatedly stated that the defendants were not involved in the civil trial that Torres had mentioned. Additionally, the court emphasized that "[t]he [civil] case involved . . . different legal issues and a different burden of proof for the Plaintiffs," and it repeated three times that the jurors must not consider any testimony about the civil trial in their deliberations.  We therefore find that the curative instruction that the court gave was worded appropriately to remedy any prejudicial effect of Torres's testimony.

Turning next to the issue of timeliness, Appellants argue that even if the instruction was appropriate, its issuance was too delayed to remedy the prejudicial effect of Torres's statement. Appellants note that thirteen days passed between Torres's testimony on July 1 and the court's curative instruction on

July 14.  Certainly, "[s]wiftness in judicial response is an important element in alleviating prejudice once the jury has been exposed to improper testimony," id., and "court[s] should proceed with the trial after instructing the jury to disregard the evidence," id. at 1184 (emphasis added).  However, we have not held that an instantaneous instruction is necessary in all instances.  See United States v. Genteles, 619 F.3d 74, 82 (1st Cir. 2010) (affirming denial of motion for mistrial where court "did not give a curative instruction immediately following the [improper] remark" but did so during its final instruction to the jury); United States v. Maccini, 721 F.2d 840, 847 (1st Cir. 1983) ("Waiting until the next day to give these instructions did not prejudice the defendant. If anything, the lapse of time aided in allowing the jury to forget what, in the context of a six-day trial, is a de minimis incident.").

In this case, the court elected to recess fifty minutes early on July 1 so that the parties could provide briefing on the mistrial issue before the court proceeded with trial.  The court then reviewed the briefs, determined a curative instruction was appropriate, and delivered that instruction immediately upon the resumption of trial, which happened to follow a pre-scheduled recess of thirteen days.  The court had previously informed the jury of the recess, and it reminded the jury of the reason for the delay in trial immediately after delivering the curative

-22-

instruction.  In these particular circumstances, we find that the judicial response to the improper testimony was sufficiently timely.

Finally, Appellants argue that the presumption that the jury follows the judge's instructions cannot apply here, and that no curative instruction could have remedied the extreme prejudice caused by Torres's testimony.  Appellants assert that Torres's testimony was likely considered authoritative because she was a law enforcement officer and it went to the central issue at trial by suggesting that the police department had been found responsible for Rivera's death.  As such, they contend, no juror could have ignored the testimony as instructed.

Although Appellants' argument on this point is not wholly without merit, on these facts, it fails for a number of reasons. First, Torres's passing reference to a civil case did not identify the claims at issue in the civil trial.  Nor did Torres state that any of the Appellants had been found liable for any injury to Rivera.  In fact, Torres did not identify any of the Appellants as parties to the civil suit.  Appellants' assertion that the jury likely inferred that the Appellants were guilty because a civil trial had been decided against different defendants on different issues is thus not persuasive.  Cf. United States v. Rullán-Rivera, 60 F.3d 16, 19-20 (1st Cir. 1995) (affirming denial of motion for mistrial that "rests exclusively on the conclusory assertion that

the jury could have inferred that [appellant] was guilty because his codefendant absconded" during trial, where court gave appropriate instruction)(emphasis omitted).  Second, Appellants ignore the fact that "within wide margins, the potential for prejudice stemming from improper testimony or comments can be satisfactorily dispelled by appropriate curative instructions." Sepúlveda, 15 F.3d at 1184.

Third, to overcome the presumption that jurors follow the court's instructions, Appellants were required to show a probability that "responsible jurors will be unable to disregard the testimony," and "the testimony likely will have a seriously prejudicial effect."  United States v. Bradshaw, 281 F.3d 278, 285 (1st Cir. 2002).  "Whether or not a jury can be expected, under proper instructions, to disregard particular evidence is a judgment call, and one as to which appellate courts typically cede a high degree of deference to the trial court."  Id. at 284.  Here, the district court found no reason to depart from the presumption that the jurors would follow its strong curative instruction, and neither do we.  As the district court properly noted, Appellants were unable to show that the testimony was likely to have a seriously prejudicial effect.  Torres was the eleventh witness for the government and the fifth to describe the events at the gas station.  Her passing reference to a civil trial against different defendants constituted a single sentence of testimony delivered

near the mid-point of a twenty-six-day trial spanning roughly two months.  Considering the sufficient record evidence to support Appellants' convictions, discussed at further length below, it is difficult to attribute any prejudicial effect to Torres's testimony.  In fact, the jury acquitted Pacheco on the charge of using excessive force resulting in injury or death, and it acquitted Vidal on the count of assaulting Rivera at the police station.

We therefore find that the district court did not abuse its discretion when it denied the motion for a mistrial and instead issued an appropriate curative instruction.

## C. Denial of motion to suppress identification

Pagán contends that the district court erred in denying his motion to suppress an in-court identification.  A brief sketch of the relevant facts follows.

### 1. Background

On June 23, 2009, the government informed the court that it had met recently with Salas to review his testimony in preparation for trial.  At that meeting, Salas volunteered that he could identify the man whom he had observed hitting Rivera at the gas station on July 20.  Salas explained that he had seen Pagán entering the courthouse a few days earlier, and he recognized him as the same man who had beaten Rivera.  Defense counsel objected to any in-court identification by Salas, arguing primarily that it was

impermissibly suggestive because no lineup had been conducted prior to trial.

On June 25, first during an evidentiary hearing and then again in front of the jury, Salas testified that he was 100 percent certain that Pagán was the man he saw punching a handcuffed Rivera in the face while at the gas station on July 20, 2003. He explained that although he did not know his name, he had seen Pagán at work four or five times prior to that night, he had seen him five or six times subsequently, and he recognized him yet again when he was entering the courthouse. Salas also stated that in their prior encounters, the two men had, on occasion, greeted each other briefly, exchanging "hellos" and handshakes.

Salas admitted that the sworn statement he composed shortly after the incident did not include a description of Pagán or his actions that night. He did not mention Pagán to investigators until his second interview with the FBI in March 2008, at which point he described him as a man around six feet one inch tall, white, husky, with a military-style haircut and wearing an Impact Unit uniform. Salas stated that he saw this tall, husky man at the gas station twice that night: first for a few seconds after Salas finished handcuffing Rivera, and again for a few seconds while the man was punching Rivera in the face. When testifying before a grand jury, Salas noted that he believed he could pick the man he had seen out of a photo lineup. However, the

government never asked Salas to attempt such a pre-trial identification.

The district court evaluated Salas's testimony and concluded that even if the identification was impermissibly suggestive, it was sufficiently reliable as a matter of law so that it could be presented to the jury for evaluation of its weight and credibility. Pagán's motion to suppress was denied.

**2. Applicable law and analysis**

Our review of the denial of a motion to suppress an identification is plenary, but we review the district court's factual findings for clear error. United States v. Rivera-Rivera, 555 F.3d 277, 283 (1st Cir. 2009); United States v. Brennick, 405 F.3d 96, 99 (1st Cir. 2005). We note at the outset that identifying evidence may only be suppressed "in extraordinary circumstances," and we "will affirm a district court's denial of a suppression motion if any reasonable view of the evidence supports it." Rivera-Rivera, 555 F.3d at 282.

To determine if extraordinary circumstances require suppression of an identification, we follow a two-step approach. First, we must consider whether the method of identification was impermissibly suggestive, and if so, we must determine if the identification was nevertheless sufficiently reliable. Id. Here, the district court assumed for the sake of argument that the

identification was impermissibly suggestive, and it proceeded to the reliability analysis.  We shall do the same.

Five factors bear on the reliability of an identification for purposes of admissibility:  1) the witness's opportunity to view the suspect; (2) the witness's degree of attention; (3) the accuracy of the witness's description prior to the identification; (4) the witness's level of certainty; and (5) the length of time between the sighting and the identification.  Rivera-Rivera, 555 F.3d at 284.  As the district court noted, Salas observed Pagán on two occasions at the gas station on July 20, 2003.  While each viewing was brief, lasting only several seconds, the two men were in close proximity.  Cf. United States v. De León-Quiñones, 588 F.3d 748, 754-56 (1st Cir. 2009) (finding sufficient reliability where witness "looked at [the defendant] for three seconds before he told her to look away").  Moreover, this was neither the first nor the last time that Salas saw Pagán.  The men had seen each other four or five times prior to the incident while at work, and Salas encountered him afterwards another five or six times, each time recognizing him as the tall, husky officer from July 20.  Cf. United States v. Recendiz, 557 F.3d 511, 526 (7th Cir. 2009) (finding in-court identification sufficiently reliable in part due to witness's familiarity and repeated encounters with defendant prior to trial). In these circumstances, Salas had sufficient opportunity to view Pagán.

Salas did not testify specifically as to his degree of attention on July 20, but his description of Pagán was accurate.[5] Moreover, Salas testified that he was "100 percent certain" that Pagán was the man he saw at the gas station on July 20, despite the fact that Pagán had gotten "somewhat fatter" and was now wearing glasses. Finally, we note that over five years passed between the events on July 20 and Salas's in-court identification of Pagán. However, we have previously upheld the admission of an identification with an even longer, nearly seven-year span between sighting and identification where other reliability criteria were sufficiently persuasive. United States v. Flores-Rivera, 56 F.3d 319, 331 (1st Cir. 1995). Here, where Salas had a number of opportunities to view Pagán before, during, and after the incident, provided an accurate description, and testified that he was 100 percent certain about his identification, we cannot find that the district court erred in admitting the identification.

---

[5] Pagán contests the accuracy of Salas's description in a single sentence, arguing that it was too general to be accurate as compared to a description in Neil v. Biggers, 409 U.S. 188, 200 (1972). Biggers does not help Pagán, however, as the Court there noted that the witness's description in that case was "more than ordinarily thorough," not the benchmark by which all other descriptions must be measured. Id. In Manson v. Braithwaite, 432 U.S. 98, 115 (1977), the Court deemed reliable a description with a similar degree of generality as the one Salas provided.

**D. Sufficiency of the evidence**

Morales, Pacheco, and Vidal each challenge the district court's denial of their motions for judgment of acquittal due to insufficient evidence. We review the denial of a Federal Rule of Criminal Procedure 29 ("Rule 29") motion for judgment of acquittal de novo. United States v. Cruzado-Laureano, 404 F.3d 470, 480 (1st Cir. 2005). In so doing, we examine the evidence in the light most favorable to the government, taking all reasonable inferences in its favor, and we ask whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. United States v. Angulo-Hernández, 565 F.3d 2, 7 (1st Cir. 2009). Accordingly, "[d]efendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008) (internal quotations and citations omitted).

We address each Appellant's arguments in turn.

**1. Morales**

Morales argues on appeal that the evidence was insufficient to support a guilty verdict as to Count One, the civil rights charge. Count One of the indictment charged Morales and other officers with, while acting under color of law, kicking, punching, and otherwise assaulting Rivera, thereby willfully depriving him of the right to be free from the use of unreasonable

force in violation of 18 U.S.C. §§ 242 and 2.[6]  Section 242 provides for an enhanced sentence if the civil rights violation results in bodily injury or death.  In Morales's case, the jury found him guilty of causing bodily injury but not guilty of causing Rivera's death.

Morales contends that the government failed to prove beyond a reasonable doubt that he deprived Rivera of the right to be free from the unreasonable use of force or that he aided and abetted others in doing so.  He suggests that the only evidence of his guilt came from the testimony of a single cooperating defendant, González.  He correctly notes that neither Salas nor Torres testified that they saw Morales at the gas station.  Morales further argues that González's uncorroborated testimony that he saw Morales kick Rivera two or three times at the gas station could not be credited because he failed to mention Morales in his first interview with the FBI.

Morales's argument lacks merit.  In short, he asks us to find that no reasonable juror could have credited González's testimony that he saw Morales kicking Rivera.  We have long held, however, that "[i]n passing upon challenges to the sufficiency of the evidence, we are bound to refrain from making independent judgments as to the credibility of witnesses."  <u>United States</u> v.

---

[6]  18 U.S.C. § 2 provides liability as a principal for one who aids and abets the commission of an offense against the United States.

<u>Ortiz de Jesús</u>, 230 F.3d 1, 6 (1st Cir. 2000) (unpublished).  We have no basis for disturbing the jury's credibility judgments in this case.  A reasonable juror could well have credited González's testimony over that of a friend of Morales who claimed he did not see him, and much of González's testimony was consistent with that of Salas and Torres who similarly observed Impact Unit officers kicking Rivera.  Accordingly, the evidence at trial, viewed in the light most favorable to the government, sufficed to support Morales's conviction on Count One.

### 2. Pacheco

Pacheco challenges his convictions under Counts Seven and Twelve, which charged him with making a material false statement to a federal agent, in violation of 18 U.S.C. § 1001, and obstructing justice, in violation of 18 U.S.C. § 1512(b)(3), respectively.  The jury acquitted Pacheco of Count One, the civil rights charge, which Pacheco suggests is evidence that the jury believed his claim that he was not at the gas station during the incident on July 20.  If the jury believed Pacheco's alibi, he argues, it could not have convicted him on Counts Seven and Twelve, since his alleged false statements were that he was not at the gas station and that he had no knowledge about the incident.[7]

---

[7]  Puzzlingly, Pacheco dedicates a substantial portion of his brief to argue that the evidence at trial was insufficient to convict him of a § 242 civil rights violation, an offense for which Pacheco was <u>not</u>, in fact, convicted.  To the extent that Pacheco may be suggesting that a conviction on the civil rights count was a

A review of the evidence quickly reveals that Pacheco's argument does not hold water. At trial, the government offered evidence that Pacheco, himself a police officer, told Puerto Rico police investigator Rufino Dávila Pérez and FBI Agent Luis Rivero that he had been with Morales and Pagán in the Impact Unit van, searching for the stolen police vehicle, on July 20. He claimed that he never went to or stopped by the gas station during the incident, that he remained at the site of the recovered patrol car, and that he had no idea how Rivera came to be injured. Salas, however, testified that he was "100 percent sure" that he saw Pacheco -- with whom Salas was personally familiar -- at the gas station during the incident on July 20, in direct contradiction of Pacheco's statements. Additionally, multiple witnesses placed the Impact Unit van -- in which Pacheco claimed to be riding -- at the gas station along with Pagán and Morales, whom Pacheco had claimed were with him searching for a police vehicle elsewhere at the time.

From this evidence, a reasonable juror could easily conclude that Pacheco lied to investigators about his alibi, actions, and knowledge of the events of July 20. In sum, the evidence was clearly sufficient to support Pacheco's convictions on the obstruction of justice and hindering a federal investigation charges.

---

prerequisite to convicting him on the obstruction and false statement offenses, this line of argument finds no support in the law and is swiftly rejected.

Pacheco protests, arguing that the convictions are inconsistent with his acquittal on Count One and thus must be reversed. Although "[c]onsistency in the verdict is not necessary," Dunn v. United States, 284 U.S. 390, 393 (1932), there is no inconsistency here. The elements of the § 242 violation, of which Pacheco was acquitted, are distinct from those of Counts Seven and Twelve.[8] Accordingly, the jury could well have found insufficient evidence to convict Pacheco on the civil rights charge while still finding beyond a reasonable doubt that Pacheco lied to investigators about where he was and what he knew regarding the assault on Rivera.

Pacheco's final argument is that even if the jury had evidence that he lied about his location or knowledge, the government still failed to show that he had the requisite intent to

_____

[8] Count Seven required that the government prove Pacheco knowingly and willfully made a statement that was false, material, and made in a matter within the jurisdiction of a federal agency. United States v. Notarantonio, 758 F.2d 777, 785 (1st Cir. 1985). Count Twelve required proof that Pacheco knowingly engaged in "misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1512(b). In contrast, Count One required that the government prove that Pacheco: 1) acted under color of law, 2) deprived Rivera of a constitutional right, 3) acted willfully, and as a result, 4) Rivera suffered bodily injury. See 18 U.S.C. § 242. Thus, the jury could have determined that there was insufficient evidence to prove beyond a reasonable doubt that Pacheco kicked Rivera and thus violated or aided and abetted the violation of Rivera's civil rights while still finding beyond a reasonable doubt that he obstructed justice and made false statements.

-34-

obstruct justice or hinder a federal investigation. The record, however, clearly contradicts Pacheco's claim. There was ample evidence, as described above, for a reasonable juror to conclude that Pacheco provided material false statements to federal agents investigating Rivera's death, and that he did so knowingly, willfully, and with the intent to prevent investigators from discovering that he and his fellow officers were present at the crime scene and were either witnesses to or participants in the assault of Rivera. We therefore find that the evidence was sufficient to support Pacheco's convictions on Counts Seven and Twelve.

### 3. Vidal

Like Morales, Vidal argues that the evidence was insufficient to prove his guilt beyond a reasonable doubt as to Count One, the civil rights charge. Additionally, Vidal contends that there was insufficient evidence to establish his guilt as to Count Four, which charged Vidal with violating Rivera's constitutional rights by intentionally failing to intervene to protect Rivera from harm at the hands of the officers in Vidal's presence and under his supervision, all in violation of 18 U.S.C. § 242.

Beginning with Count One, Vidal argues the evidence at trial showed only that he was present during Rivera's arrest and that he failed to take action. Missing, he claims, is any evidence

that he willfully participated in the assault as something he wished to bring about, such that the government failed to prove he had the requisite intent to aid and abet the commission of a civil rights violation.  The evidence at trial, however, was not limited to establishing Vidal's presence at the scene on July 20.  Multiple witnesses testified that Vidal helped hold Rivera down on the ground while the officers under his supervision encircled and repeatedly kicked Rivera.  In addition, Torres testified that he heard Vidal say "[t]his one's mine, this one's mine," as Vidal transported the badly injured Rivera to the station house.  Once at the station house, Vidal stood by and watched as Rivera was assaulted further.  From these facts, a reasonable juror could have concluded that Vidal willfully associated himself with the violation of Rivera's civil rights and participated in this violation as something he wished to bring about, in violation of 18 U.S.C. §§ 242 and 2.

Turning to Count Four, Vidal repeats that the evidence showed only that he failed to intervene while other officers beat Rivera.  He suggests that mere inaction is insufficient to merit supervisory liability for a violation of § 242, and that it was not apparent that he was acting unlawfully by failing to intervene. See United States v. Lanier, 520 U.S. 259, 265 (1997) (holding that criminal liability for deprivation of a constitutional right under § 242 requires that the unlawfulness be apparent under pre-existing

law).  He further argues that his failure to intervene as a supervisor is insufficient to support a conviction, particularly because it occurred at the gas station, where events unfolded quickly and the scene was chaotic.

Vidal's argument as to Count Four also fails.  The jury heard evidence that Vidal was a trained SJMPD officer, and that as a result, he would have known that kicking and punching a restrained suspect who posed no threat to others went well beyond the acceptable use of force.  In other words, Vidal cannot plausibly suggest that allowing his subordinates to repeatedly and violently assault a handcuffed suspect constituted anything other than an act of apparent unlawfulness and a clear violation of Rivera's civil rights.  See United States v. Serrata, 425 F.3d 886, 896 (10th Cir. 2005) (finding sufficient evidence to uphold a § 242 conviction where a prison guard stood by and watched an unjustified assault on a person in his custody despite being in a position to intervene);  see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety. . . .  [An] affirmative duty to protect arises . . . .").

As we stated in Wilson v. Town of Mendon, 294 F.3d 1 (1st Cir. 2002), a supervisor can be held liable for his failure to

intervene to protect an arrestee from his subordinates' excessive use of force when his "action or inaction [is] affirmative[ly] link[ed] . . . to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." Id. at 6 (internal quotations and citation omitted). In this case, the jury heard that Vidal held Rivera on the ground while officers kicked him, permitted an officer to punch the handcuffed Rivera in the face without comment, told his officers "this one's mine" as he transported a severely injured Rivera to the station house rather than a hospital, and again watched without intervening as Rivera was further assaulted at the station house. Vidal's supervisory "acquiescence or gross negligence amounting to deliberate indifference" as to the repeated assaulting of Rivera by his subordinates was thus well-documented. In these circumstances, we have no doubt that the "evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime." United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009) (internal quotations and citations omitted).

**E. Jury Instruction**

For the first time on appeal, Morales argues that the district court erred when it instructed the jury that it could

infer consciousness of guilt from the defendants' statements and actions.  Morales concedes that he failed to preserve this claim as he did not object to the instruction below, and accordingly, we review for plain error only.  See United States v. Combs, 555 F.3d 60, 63 (1st Cir. 2009).  Morales thus bears the burden of showing that: "an error occurred, which was clear or obvious, and which not only affected the defendant's substantial rights, but also seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Id. (internal quotations and citations omitted).

Morales takes issue with the following language from the court's instruction:

> When a defendant voluntarily . . . makes a statement tending to establish his innocence, and such . . . statement is later shown to be proven beyond a reasonable doubt knowingly false in whole or in part, the jury may consider whether this circumstantial evidence points to a consciousness of guilt as to the civil rights violation.  No one can be convicted of a crime on the basis of consciousness of guilt alone.

In short, Morales argues that this language improperly relieved the government of its burden of proof as to the element of intent for Count One.  He theorizes that the instruction told the jury that Morales's statements had already been proven false, thus improperly establishing consciousness of guilt, a prejudicial misstep necessitating a new trial.

-39-

Morales's argument is, at best, ill conceived.  We have long recognized that trial courts have "broad discretion in deciding how best to communicate complicated legal rules to a lay jury," United States v. Newell, 658 F.3d 1, 19 (1st Cir. 2011), and here the record shows that the district court acted well within its discretion.  Morales's argument to the contrary ignores the conditional language that the court used to preface its instruction and transforms language about potential findings into an assertion of proven fact.  In short, Morales's reading of the instruction is simply not supported by the record.

In reality, the court properly instructed the jury that the government bore the burden of proving "each of the elements of the crimes charged beyond a reasonable doubt," and the consciousness of guilt instruction did not contradict this requirement.  Morales has thus failed to demonstrate any error in the court's consciousness of guilt instruction, let alone plain error.[9]

---

[9]  Morales also notes, without developed argumentation, that the court later instructed that "intent is a statement of mind and can be proven by circumstantial evidence.  Indeed, it can rarely be established by any other means."  Although it is not clear whether Morales seeks to challenge this instruction, we note that this language is clearly not erroneous and does not lower the government's burden of proof, but rather instructs the jury as to the types of evidence it may consider.

**F. Variance**

Morales also argues that there was a material variance regarding Count Sixteen of the indictment, which charged him with making false statements to a federal grand jury, in violation of 18 U.S.C. § 1623. "A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment." United States v. Dellosantos, 649 F.3d 109, 116 (1st Cir. 2011) (quoting United States v. Manqual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009)) (internal quotation marks omitted). Morales failed to raise this objection below, and thus we review only for plain error. Combs, 555 F.3d at 63.

The indictment alleged that Morales made six false statements to the grand jury. These statements included assertions that Morales did not go to the gas station, that he did not see Rivera at the gas station, that he did not know how Rivera was injured, and that he did not participate in any way in the arrest of Rivera. Morales now argues that no evidence was offered to show that he participated in Rivera's arrest. This, he claims, demonstrates a material variance as to Count Sixteen that affected his substantial rights. He suggests that he was unfairly prejudiced by spillover evidence regarding his codefendants' participation in the arrest, and that reversal is thus required.

Significantly, however, Morales concedes that the government's evidence placed him at the gas station and kicking Rivera at the time of the arrest, although he claims it was not specified whether the kicks happened before or after Rivera was handcuffed. In either case, a reasonable juror could have easily concluded that kicking Rivera at the gas station as officers were bringing him into custody constituted some form of participation in the arrest. In sum, the evidence at trial proved precisely the facts alleged in the indictment.

Moreover, even if there was a variance as to Morales's participation in Rivera's arrest, Morales has made no showing of materiality or prejudice. See United States v. Twitty, 72 F.3d 228, 231 (1st Cir. 1995) ("[T]he jury can convict even if the facts found are somewhat different that those charged -- so long as the difference does not cause unfair prejudice."). As we have previously explained, "[a] jury need not believe that the defendant did everything that the indictment charges; it may convict if it believes he did some of the things the indictment charges," so long as "those things, by themselves, amount to a violation of the statute, [and] the indictment enables the accused to know the nature and cause of the accusation against him." United States v. Mueffelman, 470 F.3d 33, 38-39 (1st Cir. 2006) (internal quotation marks and brackets omitted). Here, Morales's statement that he did not participate in Rivera's arrest was but one of six false

statements set out in the indictment to support a conviction under 18 U.S.C. § 1623.  Morales does not and cannot refute the fact that the jury heard evidence directly contradicting each of his other statements to the grand jury as described in Count Sixteen of the indictment.  Thus, Morales has failed to show a material variance between the allegations in Count Sixteen and the evidence at trial that affected his substantial rights.

## G. Vidal's Sentence

Vidal's final claim on appeal is that the district court erred in sentencing him on Counts One and Four when it used the wrong Sentencing Guidelines manual to calculate his base offense level. By applying the less favorable Guidelines in effect on the date of sentencing rather than the Guidelines manual in effect at time of the offense, Vidal argues, the court violated the Ex Post Facto Clause of the Constitution.  See U.S. Const. art. I, § 9, cl. 3.

### 1. Background

On August 13, 2009, Vidal was convicted on Counts One and Four of violating Rivera's civil rights and causing his death, in violation of 18 U.S.C. § 242.  Vidal was also convicted on Counts Nine and Fifteen, for making false statements in violation of 18 U.S.C. § 1001 and obstructing justice in violation of 18 U.S.C. § 1512(b)(3), respectively.  The offense conduct pertaining to Counts One and Four took place in July 2003, while the offense

conduct pertaining to Counts Nine and Fifteen occurred in March 2008.

At sentencing, the district court adopted the Guidelines calculations set forth in the Presentence Report ("PSR"). Using the November 2009 edition of the Guidelines manual, to which Vidal did not object, the court grouped Vidal's four offenses of conviction pursuant to U.S.S.G. § 3D1.2(b) and (c).[10] The court then calculated Vidal's total offense level to be 39, which produced a Guidelines sentence range of 262 to 327 months. After considering the relevant sentencing factors, the district court announced a below-Guidelines sentence of 200 months of imprisonment as to Counts One and Four, and 57 months of imprisonment as to Counts Nine and Fifteen, all to be served concurrently.

---

[10]   U.S.S.G. § 3D1.2 instructs that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." This provision applies "[w]hen counts involve the same victim and two or more acts . . . connected by a common criminal objective or constituting part of a common scheme or plan," § 3D1.2(b), and "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts," § 3D1.2(c). The application notes to these instruction add that "when conduct that represents a separate count, e.g., . . . obstruction of justice, is also a specific offense characteristic in or other adjustment to another count, the count represented by that conduct is to be grouped with the count to which it constitutes an aggravating factor." U.S.S.G. § 3D1.2(c) application n.5.

### 2. Applicable law and analysis

Vidal now argues that because his offenses under Counts One and Four were completed on July 20, 2003, the court should have used the Guidelines manual in effect on that date -- the November 2002 manual -- to calculate his offense level. He notes that the November 2002 manual provided a base offense level of 25 as to Counts One and Four, but that the subsequent amendment of the Guidelines in 2004 resulted in a four-level increase in the applicable base offense level. As a result, his total offense level was increased from 34, with a Guidelines range of 168 to 210 months, to 39, with a corresponding range of 262 to 327 months. This significant increase in the applicable Guidelines range, Vidal argues, evidences an ex post facto violation that necessitates resentencing. Because Vidal failed to raise his ex post facto arguments below, we review his claim only for plain error. United States v. Rodríquez, 630 F.3d 39, 41 (1st Cir. 2010).

The Ex Post Facto Clause "forbids the application of any law or rule that increases punishment for pre-existing conduct." United States v. Regan, 989 F.2d 44, 48 (1st Cir. 1993). Accordingly, the Sentencing Guidelines have long instructed district courts to apply the Guidelines in force at the time of sentencing unless doing so would raise ex post facto concerns, in which case the sentencing court should apply the Guidelines in effect at the time of the offense of conviction. U.S.S.G. § 1B1.11

(b)(1) (policy statement).  We have commended this practice, noting that "avoiding even the slightest suggestion of an ex post facto problem . . . makes eminently good sense regardless of whether the practice stems from a constitutional imperative."  Rodríguez, 630 F.3d at 42.

The issue is often complicated, however, when defendants like Vidal are sentenced for multiple convictions arising from offenses committed over a period of time that spans multiple versions of the frequently-revised Guidelines.  In this situation, the Sentencing Guidelines provide additional instruction.  The Guidelines' one book rule specifies that a single version of the Guidelines should be applied for all convictions at sentencing.  See id. § 1B1.11(b)(2).  The Guidelines also provide instruction as to the multiple-offense scenario, so that "[i]f the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses."  Id. § 1B1.11(b)(3).

These sentencing practices are firmly rooted in the case law of this circuit.  See, e.g., United States v. Silva, 554 F.3d 13, 22 (1st Cir. 2009); Cruzado-Laureano, 404 F.3d at 488.  In Cruzado-Laureano, the defendant was convicted on eleven counts of money laundering, extortion and embezzlement, all of which involved offense conduct completed prior to the effective date of a new

Guidelines manual. 404 F.3d at 488. However, because Cruzado-Laureano's conviction on a twelfth count -- witness tampering -- was based in part on an act that took place a month after the new manual went into effect, we found that the district court erred in using an earlier Guidelines manual at sentencing rather than the manual in effect at the time that the last offense of conviction was completed. Id. We reaffirmed this holding in United States v. Gilman, 478 F.3d 440, 449-50 (1st Cir. 2007) (finding no ex post facto violation where newly revised manual was applied to all counts of conviction because a single wire transfer was executed after the revised manual's effective date), and again in Silva, 554 F.3d at 22 (finding no ex post facto violation where revised manual governed sentencing for multiple convictions stemming from offenses variously committed over a span of approximately five years).

Vidal's last offense of conviction took place in March 2008, when he lied to investigators and obstructed justice in an effort to conceal his participation in having caused Rivera's death. Thus, according to the Guidelines' instructions and our case law, the November 2007 manual that was in effect in March 2008, not the pre-amendment November 2002 manual that Vidal favors, should have applied at Vidal's sentencing.[11] Vidal protests,

---

[11] The district court at sentencing actually applied the Guidelines in effect on the date of sentencing, the November 2009 Guidelines, rather than the November 2007 Guidelines. However, both manuals post-dated the 2004 amendment and thus both produced the same four-level increase in Vidal's base offense level and the same

arguing that the one book rule cannot determine the outcome of this issue as the rule itself violates the Ex Post Facto Clause of the Constitution as applied to his case. Specifically, he argues that the obstruction convictions are "relatively minor 'cover-up' offenses" that should not be permitted to increase the Guidelines range of his prior, more serious offenses without fair notice.

We have not yet squarely addressed the constitutionality of the one book rule, preferring to avoid answering unnecessary constitutional questions. See United States v. Goergen, 683 F.3d 1, 4 (1st Cir. 2012) ("Goergen's brief -- although opaque on this issue -- may be arguing that the guidelines instructions themselves (particularly the one book and multiple offense rules) violate the Ex Post Facto Clause . . . . [A]ssuming such an argument . . . could be considered . . . in the teeth of contrary circuit precedent, any such mistake would be harmless.") (internal citations omitted). In this case, however, there can be no denying that the use of the amended Guidelines manual negatively and seriously impacted Vidal's Guidelines range as calculated by the district court. Moreover, the government's argument that the Ex

_____

Guidelines range for Vidal's total offense level. Accordingly, to the extent that the court erred by applying the 2009 rather than the 2007 Guidelines -- a point which Vidal does not argue -- we find that such error was harmless. Cf. Silva, 554 F.3d at 22 ("the correct comparison is between the 2006 Guidelines, which the district court employed, and the 2004 Guidelines, in effect on the date that Silva's last offense of conviction was completed. . . . Our analysis of the 2004 and 2006 Guidelines reveals no relevant differences that would affect Silva's sentence.").

Post Facto Clause does not apply to the now-advisory Guidelines has been foreclosed by the Supreme Court's recent holding to the contrary in Peugh v. United States, 133 S. Ct. 2072, 2079 (2013). Thus, the question of the one book rule's constitutionality is now squarely before us.

We find that the one book rule does not violate the Ex Post Facto Clause as applied to a series of grouped offenses like Vidal's. In so holding, we make explicit what has long been implicit in the case law of this circuit. See Goergen, 683 F.3d at 4; Silva, 554 F.3d at 22; Gilman, 478 F.3d at 449-50; Cruzado-Laureano, 404 F.3d at 488. This decision is also consistent with the findings of an overwhelming majority of our sister circuits. United States v. Kumar, 617 F.3d 612, 626-28 (2d Cir. 2010) ("We conclude that the one-book rule set forth in § 1B1.11(b)(3) does not violate the Ex Post Facto clause when applied to the sentencing of offenses committed both before and after the publication of a revised version of the Guidelines.") (emphasis omitted); United States v. Duane, 533 F.3d 441, 449 (6th Cir. 2008) ("[W]here, as here, offenses grouped together for sentencing purposes were committed before and after an amended version of the Guidelines went into effect, the use of the amended version of the Guidelines does not violate the Ex Post Facto Clause."); United States v. Sullivan, 255 F.3d 1256, 1262-63 (10th Cir. 2001) (same); United States v. Vivit, 214 F.3d 908, 918-19 (7th Cir. 2000) ("[W]e

believe that the enactment of the grouping rules provides fair notice such that the application of §§ 1B1.11(b)(3) and 3D1.2 does not violate the Ex Post Facto Clause."); United States v. Lewis, 235 F.3d 215, 218 (4th Cir. 2000) ("[I]t was not § 1B1.11(b)(3) that disadvantaged Lewis, but rather her decision to commit further acts of tax evasion after the effective date of the 1993 guidelines."); United States v. Kimler, 167 F.3d 889, 893-95 (5th Cir. 1999) ("[A] defendant has notice that the version of the sentencing guidelines in effect at the time he committed the last of a series of grouped offenses will apply to the entire group."); United States v. Bailey, 123 F.3d 1381, 1404-07 (11th Cir. 1997) (same); United States v. Cooper, 35 F.3d 1248, 1250-53 (8th Cir. 1994), vacated, 514 U.S. 1094 (1995), reinstated, 63 F.3d 761, 762 (8th Cir. 1995) (per curiam) (same).  But see United States v. Ortland, 109 F.3d 539, 546-47 (9th Cir. 1997) (finding ex post facto violation where district court applied revised Guidelines to all five mail fraud counts, only one of which involved conduct committed after the amendment).[12]

---

[12]   The Third Circuit, in 1994, found that the application of the one book rule to grouped conduct committed before and after a Guidelines revision violated the Ex Post Facto clause.  United States v. Bertoli, 40 F.3d 1384, 1404 (3d Cir. 1994) ("The fact that various counts of an indictment are grouped cannot override ex post facto concerns. . . .").  More recently, however, the court distinguished Bertoli as having involved "discrete, unconnected" acts that were grouped improperly, and it found no ex post facto violation because "grouping provisions, combined with the one-book rule, place a defendant on notice that a court will sentence him or her under the Guidelines Manual in effect during the commission of

Vidal argues that we cannot uphold the application of the one book rule to his case because he lacked proper notice as required by the Ex Post Facto Clause. He concedes that, had he consulted the Guidelines in 2003, he "could have suspected . . . that any punishment for his § 242 offenses could be enhanced (under the one-book rule) were there to be a subsequent amendment and were he to commit another federal offense after that amendment took effect." He concludes that this notice, however, was insufficient, citing Miller for the proposition that Ex Post Facto violations "cannot be avoided merely by adding to a law notice that it might be changed." Miller, 482 U.S. at 431.

Vidal is correct insofar as he argues that the issue of notice is central to our Ex Post Facto analysis. "Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." Weaver v. Graham, 450 U.S. 24, 30 (1981). In this case, however, Vidal had far more than mere notice that the Guidelines "might be changed." The Sentencing Guidelines' one book and grouping rules placed Vidal on notice that if he committed a closely related offense in the future, his sentence for both offenses would be calculated pursuant to the

his or her last offense in a series of continuous, related offenses." United States v. Siddons, 660 F.3d 699, 706-07 (3d Cir. 2011).

Guidelines in effect at the time of that later, related offense conduct. The Guidelines' grouping provisions became effective in 1987, and the one book and multiple offense rules, U.S.S.G. § 1B1.11(b), became effective in 1993. In other words, both Guidelines instructions were enacted well before Vidal's offense conduct occurred, and he nevertheless elected to proceed with the commission of obstruction offenses that would trigger the application of the revised Guidelines. Accordingly, the change in Vidal's offense level is properly viewed not as a consequence of an ex post facto violation, but as the direct result of his decision to engage in closely related offense conduct in 2008. See Kumar, 617 F.3d at 629 ("Here, the defendants' [later] obstruction offense is the 'actual crime' triggering the application of the one-book rule, the defendants had prior notice of the consequences of that crime, and therefore the application of the one-book rule is proper."). Therefore, the Supreme Court's holding in Peugh, 133 S. Ct. at 2078, that sentencing a defendant under current Guidelines providing a higher sentencing range than Guidelines in effect at the time of the offense is a violation of the Ex Post Facto Clause, is inapplicable here because Peugh did not involve the application of the one book rule to a series of grouped offenses like Vidal's.

Notably, we do not suggest that all applications of the one book rule will in all cases satisfy the Ex Post Facto Clause's requirements. We do not, for example, condone the retroactive

application of Guidelines made more severe after the last offense of conviction occurred.  In this case, however, the application of the amended Guidelines to Vidal's grouped convictions, pursuant to the one book rule, did not constitute a violation of the Ex Post Facto Clause.

## H. Morales's Sentence

Morales's final claim is that he was a minor participant in the assault on Rivera and that the district court erred in not granting him a downward departure pursuant to U.S.S.G. § 3B1.2(b). We recognize the sentencing court's broad discretion to determine the appropriateness of a downward departure, and "we will reverse only if the evidence overwhelmingly demonstrates that the defendant played a part that makes him substantially less culpable than the average participant such that the court's decision was clearly erroneous." United States v. Brandon, 17 F.3d 409, 460 (1st Cir. 1994); see also United States v. García-Ortiz, 657 F.3d 25, 29 (1st Cir. 2011).  The burden of producing such overwhelming evidence falls on Morales, as "[a] defendant who seeks a downward role-in-the-offense adjustment must prove her entitlement to it." United States v. Teeter, 257 F.3d 14, 30 (1st Cir. 2001).  Faced with this uphill battle, Morales's claim of error falls flat.

At sentencing, Morales sought a sentence lower than those imposed on his co-defendants who cooperated, arguing among other things that he did not participate in the continued assault on

Rivera at the police station and that the jury did not find that his actions caused Rivera's death. The district court concluded that although Rivera may have had a relatively "lesser role" as compared to certain defendants, it could not ignore the fact that Morales had kicked Rivera with his booted foot, nor could Morales prove that his kicks had caused less injury to Rivera than the kicks of others at the gas station. Moreover, the court reasoned that the sentences imposed on the cooperating defendants were not an appropriate point of comparison as, unlike Morales, they had accepted responsibility in a timely manner and provided valuable cooperation to the government. After calculating the Guidelines range at 135 to 168 months of imprisonment, the court noted that Morales was a first-time offender with an otherwise unblemished record as a police officer, and it ordered a below-Guidelines sentence of 120 months.

The court properly rejected Morales's claim that he merited a downward departure because he "only" kicked Rivera two or three times at the gas station and did not continue the assault at the station house. It also clearly explained why Morales's sentence should not be compared to those of cooperating co-defendants who accepted responsibility. Thus, the district court did not err, let alone clearly err, in denying the minor participant departure when sentencing Morales to a term of 120 months of imprisonment.

## III. <u>Conclusion</u>

For the above-stated reasons, we affirm.

**<u>Affirmed</u>**.